**People of the State of Illinois, Plaintiff-Appellee, v. Nathaniel McGuirk, Defendant-Appellant.**

Gen. No. 51,584.

First District, Third Division.

February 20, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Professor James R. Thompson, Northwestern University School of Law, and James J. Doherty, and Marshall J. Hartman, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Howard Levine, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

Nathaniel McGuirk was sentenced to twenty to thirty years in the penitentiary after being found guilty, in a nonjury trial, of rape and indecent liberties.

The prosecutrix, a nine-year-old girl, was mistreated and raped by McGuirk who was the janitor of the building in which she lived. In the early afternoon of August 14, 1964, he pulled her down the basement stairs and into his apartment. After he overcame her resistance and raped her, she hid under the bed. A woman who lived in an apartment adjoining McGuirk's heard a girl say, "You hurt me" and McGuirk reply, "If you do what I tell you to do I won't hurt you any more." She went to McGuirk's kitchen door and looked through the keyhole. She saw him standing naked beside his bed and saw blood on the bedspread. The child's voice was coming from under the bed. The woman forced the door open and hurried back to her apartment to get a knife. When she re-

turned she saw McGuirk, who had put on some clothing including a bloody shirt, take the prosecutrix from under his bed and carry her into the boiler room. The woman locked the boiler room door to prevent his escape.

In the meantime, another resident of the building had heard the disturbance and went to the front door of Mc-Guirk's apartment. When he heard a little girl cry out, "No, you are going to hurt me," he ran to get the police. More neighbors gathered and a policeman came. The officer entered the boiler room and found McGuirk behind the furnace trying to put on his pants. His underclothing and the lower front part of his shirt were bloody.

The child's underclothing and dress were also bloody. She was taken to a hospital and was still bleeding when she arrived there. The examining doctor testified that no sperm was found in her vagina but that her hymen was torn and there were fresh lacerations between her vagina and rectum.

It is not disputed that the evidence established the defendant's guilt beyond reasonable doubt but it is contended, among other things, that the State failed to prove him sane at the time of the crime and that the court erred in not conducting a hearing as to his competency to stand trial.

The defendant testified that he finished school at the end of the sixth grade and worked off and on thereafter until he entered the army (in 1943). He served for three years and received an honorable discharge. In February 1949 he was convicted of indecent liberties and the rape of a young girl and was sentenced to the penitentiary for 17 to 20 years. He was released in 1959 and worked at various jobs until 1963, when he was again arrested. He was confined in the Mental Health Clinic of Cook County following his arrest and was discharged early in 1964. He started working as the janitor of the building in which the prosecutrix lived in March 1964 and, although married, was living alone at the time of the assault.

He further testified that he decorated a room in the building the night before the assault and did not finish until 6:00 or 7:00 a. m. He and a friend drank a half pint of whiskey and when his friend left about 11:00 a. m. he went to bed. He said he awakened in the afternoon, ran to the boiler room to fire the boilers and while there cut his toe on a piece of glass. He brought the bleeding toe up to his body to examine it and was returning to his apartment to take care of it when he was confronted by a policeman and his next-door neighbor. He denied being naked at any time and said that as far as he knew the blood on his clothing came from his toe.

The defendant argues that his testimony tended to prove that he had "blacked out" at the time of the offense and that his "amnesia" came from a mental disorder. He argues further that this, plus his prior confinement in the Mental Health Clinic, was sufficient to raise the affirmative defense of insanity and that the State failed to sustain its burden of proving him sane beyond a reasonable doubt.

██ Section 6-2(b) of the Criminal Code states that a person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to either appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Ill Rev Stats 1963, c 38, par 6-2(b). The defense of insanity is an affirmative defense (c 38, par 6-4) and if the State's evidence does not raise the issue of an accused's sanity the burden is on him to do so. Once evidence of insanity is introduced, the burden devolves on the State to prove beyond a reasonable doubt that at the time of the crime the accused was sane. Chapter 38, paragraph 3-2(a), (b); People v. LeMay, 35 Ill2d 208, 220 NE2d 184 (1966).

██ The State's evidence did not create any doubt of the defendant's sanity, and if he wished to raise the issue as an affirmative defense it was his obligation to

271

present some evidence in this regard. This he did not do. There was no opinion testimony as to his mental condition and he did not testify that he blacked out. He testified that after having had no sleep the night before he went to bed at eleven in the morning and slept until shortly before he was accused of the crime. He said, in effect, that he did not commit the crime because he was sleeping at the time it was supposed to have taken place. The defendant's argument amounts to this: the evidence of his guilt is so overwhelming that he must have blacked out if he did not remember committing the crime. This argument not only contradicts his own testimony but presupposes that he was telling the truth when he testified that he did not remember having anything to do with the prosecutrix. Further, although he had been sent to the Mental Health Clinic following his arrest for arson in 1963, he was discharged after nine days of observation and remanded to the custody of the police. This evidence did not rebut the presumption of sanity. The trial court was justified in finding that McGuirk was sane beyond a reasonable doubt and did not err in denying his motion for a finding of not guilty on this issue.

Different factors enter into the defendant's contention that the court erred in not holding a hearing as to his competency to stand trial. Upon the defendant's motion, made before trial, the court ordered an examination by the Behavior Clinic of the Criminal Court of Cook County. The resulting report found that the defendant had a sociopathic personality disturbance but that he knew the nature of the charge against him and was able to cooperate with his counsel. It also stated that he was not committable to an institution for the mentally ill or the mentally defective. A supplemental report revealed that he had been examined in 1963 by the Psychiatric Institute of the Municipal Department of the Circuit Court, was diagnosed as "Schizophrenic Reaction, Paranoid Type" and was certified to the Mental Health Clinic.

At the clinic he was diagnosed as not psychotic and was discharged. After his arrest in August of 1964 he was again referred to the Psychiatric Institute and was examined by two psychiatrists. The diagnosis was that he had a schizoid personality, was not psychotic, could have a potential primitive, impulsive behavior, but was able to cooperate with counsel. He had been married twice and had two children by his second wife. He was separated from her and it was reported that he had a personality change after the separation. A sister of his thought he was deteriorating from living alone. He was described as active, shy, sympathetic, good-natured, generous, able to get along well with others, restless, easily led and reliable. The supplemental report concluded that he knew the nature of the charge and was able to cooperate with counsel.

At the defendant's request the court also ordered an examination by two psychiatrists of the defendant's own choosing, and the trial was postponed pending the examination. The examination was held but the report was not submitted to the court.

Nothing was said about a competency hearing until both sides had rested. In moving for an acquittal, the defendant's attorney for the first time said that there was a "serious question of the competency of this defendant to stand trial." It is argued in this appeal that the Behavior Clinic report, the history of the defendant and his testimony, raised a bona fide doubt of the competency of the defendant and that the court should have ordered a competency hearing on its own motion, and that its failure to do so was a violation of due process and deprived the defendant of a fair trial.

 If, during a trial, the court has reason to believe that the defendant is incompetent, it becomes the court's duty to order a sanity hearing (Ill Rev Stats 1963, c 38, § 104–2(b)) and "this is true even if counsel does not raise or argue the point in the trial court."

People v. Bender, 27 Ill2d 173, 188 NE2d 682 (1963). However, it is within the discretion of the court to decide whether the facts and circumstances raise a bona fide doubt of the defendant's competency. People v. Pridgen, 37 Ill2d 295, 226 NE2d 598 (1967). The statute defines an incompetent person as one who is unable because of physical or mental condition to understand the nature and purpose of the proceedings against him, or to assist in his defense. Ill Rev Stats 1963, c 38, § 104–1(a), (b). The report of the Behavior Clinic, signed by two psychiatrists, found that McGuirk knew the nature of the charge against him and that he was able to cooperate in his own defense. The report of the Psychiatric Institute was to the same effect. He had been examined by private psychiatrists and it is a reasonable inference that if their report was contrary to that of the court's psychiatrists it would have been brought to the attention of the court. Moreover, McGuirk testified clearly and responded lucidly to the questions asked him on direct and cross-examination. Under all these circumstances it is understandable why the court did not have a bona fide doubt of his competency to stand trial and the court did not abuse its discretion in not calling for a competency hearing.

Two other points assigned by the defendant pertain to the testimony of the prosecutrix. He claims that the trial court erred in permitting her to testify and that the prosecutor told her what to say in court.

During the preliminary examination as to her competency by the prosecutor she said that she had attended church and had been taught about lying; that she knew what it meant to tell the truth but forgot what happened to little girls who told lies. In response to questions by the court, she said she knew the difference between lying and telling the truth and that she would tell the truth. She also said that she knew the dif-

ference between heaven and hell and that persons who did not tell the truth went to hell. Under cross-examination she replied that she had not known that one who lied went to hell until the prosecutor talked to her before she testified.

 Whether a witness shall be permitted to testify when an objection has been interposed as to her competency because of age or understanding, is a matter resting largely in the discretion of the trial court. People v. Schladweiler, 315 Ill 553, 146 NE 525 (1925). The pretrial preparation by the prosecutor in impressing upon the child the obligation to speak truthfully was not improper and did not deprive the defendant of a fair trial. The record does not support the defendant's contention that the prosecutor supplied her with the words needed to establish her competency. While her answers on direct examination indicated some confusion (she was crying and said she was both frightened and unafraid) they did not disqualify her as a witness. Her responses to the subsequent questions of court and counsel showed that she was intelligent, that she knew the difference between truth and falsity and that she appreciated the moral duty to tell the truth. People v. Davis, 10 Ill2d 430, 140 NE2d 675 (1957). The court did not err in permitting her to testify.

In cross-examination, following her testimony in chief, the prosecutrix testified that the prosecutor had read something to her (a transcript of her testimony before the grand jury) and told her to say the same thing that was on the paper. She also answered "yes" to the following questions:

> "And you want to do what the nice man says, do you not, honey?"
>
> "Did he tell you that he [McGuirk] would be the only colored man that was sitting at the table?"

275

"And he told you to point out the colored man, did he not, is that right, honey?"

"And you would do what the man says, would you not, honey, because he is a good man?"

"Whatever he says you are to say you would say, is that not right honey?"

On re-direct examination she reaffirmed that the prosecutor had told her "some to say" and that he had said that the man she was to identify would be seated at the table.

 An attorney is bound by the testimony of his witnesses and there is nothing improper in refreshing their memories before they take the stand. Reviewing their testimony before trial makes for better direct examination, facilitates the trial and lessens the possibility of irrelevant and perhaps prejudicial interpolations. It is particularly advisable in a sex case to prepare a prosecutrix for the ordeal she will face in the courtroom. A State's attorney must go over her story with her, ease her embarrassment, familiarize himself with the sexual terms she uses and perhaps suggest others. There is nothing wrong with this if the witness's essential testimony is neither altered nor colored by emphasis or suggestion.

 A more serious question is raised by the testimony of the prosecutrix that the prosecutor told her "some to say" and to identify the colored man at the counsel table. It is highly improper for a prosecutor to induce a witness to say anything but the truth and it is a denial of due process for a conviction to be obtained on testimony known by the prosecution to be false. Napue v. Illinois, 360 US 264, 79 S Ct 1173 (1959). What the prosecutor told the child to say, however, is not disclosed in the record. The case was tried before the court and the court was aware of her statement and could weigh the truth of her testimony accordingly. There was

276

ample corroboration of her testimony and no reason to suspect that the "some to say" included untruthful suggestion.

Although the prosecutor told the prosecutrix that McGuirk would be seated at the counsel table the implication that this induced his identification is not justified under the facts of this case. She was not identifying a stranger. The defendant was the janitor of the building in which she lived and they had spoken together several times before the day of the crime. Moreover, she testified that she informed the prosecutor that McGuirk had raped her and that he never used the defendant's name until she mentioned it to him.

This is not a case where the defendant's conviction rests solely upon the testimony of the complaining witness. The defendant was almost caught in the act. The corroborating evidence surrounding the commission of the crime—her presence in his room, her crying out that he had hurt her, his nakedness, her torn hymen and perineum, the fresh blood on the bedspread, on his clothing and on hers, his taking refuge in the boiler room and his apprehension at the scene of the crime—would justify the finding of guilty even if her testimony were less convincing than it was.

The defendant complains that he was sentenced for offenses which arose out of the same conduct and that the two sentences could prejudice his chances for parole.

 The court found the defendant guilty of both rape and indecent liberties but only one sentence was imposed. In pronouncing sentence the court stated:

> "Based upon the evidence and the type of crime involved the court will sentence the defendant to the penitentiary for a period of not less than 20 nor more than 30 years."

The twenty- to thirty-year sentence was within the statutory limits for the crime of rape (Ill Rev Stats 1963,

c 38, § 11–1(c)) but was in excess of the one to twenty-year punishment provided for the crime of indecent liberties (c 38, § 11–4(c)). Since the sentence was appropriate only to the crime of rape it must be presumed that it was for this offense and this offense alone that the sentence was imposed. The common-law record, however, states that the defendant was sentenced for both offenses. This is erroneous and the judgment as to indecent liberties will be reversed.

The conviction and sentence for rape are affirmed. The judgment for indecent liberties is reversed.

Affirmed in part and reversed in part.

SULLIVAN, P. J. and SCHWARTZ, J., concur.