THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD BRADFORD et al., Defendants-Appellants.

First District (6th Division)   Nos. 1—87—1623 through 1—87—1626 cons.

Opinion filed August 25, 1989.

Giovanni & Goldberg, of Chicago (Dennis A. Giovanni and Herbert L. Goldberg, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:

Defendants, Donald Bradford, Green Smith, Luther Woods and Michael Smith were charged by indictment with possession of a controlled substance with intent to deliver. (Ill. Rev. Stat. 1985, ch. 56½, par. 1401.) Prior to trial, Bradford brought a motion to suppress physical evidence against him. The motion was heard concurrently with the trial and was ultimately denied. Following a joint bench trial, Bradford was convicted of possession with intent to deliver 9.98 grams of heroin and was sentenced to a term of 14 years. Green Smith was convicted of possession with intent to deliver 126.19 grams of heroin and was sentenced to a term of 40 years. Woods was convicted of possession with intent to deliver 16.54 grams of heroin and was sentenced to a term of 40 years. Michael Smith was convicted of possession with intent to deliver 17.27 grams of heroin and was sentenced to a term of 20 years. The sentences of Green Smith, Luther Woods and Donald Bradford were enhanced based upon previous offenses by these defendants. Ill. Rev. Stat. 1985, ch. 56½, par. 1408.

The issues raised on appeal are whether (1) the State presented sufficient evidence to prove the defendants guilty beyond a reasonable doubt; (2) the trial court erred in denying Bradford's motion to suppress physical evidence; (3) the trial court erred in sentencing Green Smith, Luther Woods and Donald Bradford to enhanced prison terms; (4) the defendants' sentences were excessive; and (5) the trial court erred in considering information that was not presented as evidence at trial.

The evidence adduced at trial established that on April 14, 1986, Chicago police officers Michael Daukus, James Keating and Arthur Jackson were assigned along with Sergeant Thomas Eichler to provide security at two summer job program sites located at 26th Street and Kolin Avenue and at Cermak Road and Marshall Avenue. The officers were in an unmarked police car driven by Officer Daukus. Officer Jackson was in the front passenger seat, Eichler sat behind Daukus, and Keating was in the rear passenger seat. About 9:30 a.m., while en route to the job program at Cermak Road and Marshall Avenue, Daukus drove east on Cermak beyond Avers Street. There the officers observed a group of people standing on both sides of Avers Street. Some of these people were known by the officers on patrol. All of these individuals ran in different directions when they saw the police car.

The officers also saw another group of people standing on the east side of Avers Street near the middle of the block. This group, consisting of the four defendants, was standing in front of a three-

story building which was directly south of a vacant lot with a seven-foot cyclone fence in the front. There were no numbers on the building indicating its address, but it was at or near 2241 South Avers Street. Green Smith was standing in front of the doorway of the building. Woods, Bradford and Michael Smith were about 10 feet away and near the gate into the vacant lot. A fifth individual, later identified as Calvin Wilder, was standing about 40 or 50 feet away from the defendants at the north end of the vacant lot. Eichler directed Daukus to drive down Avers Street in order to "check [this group] out." At Eichler's suggestion, Daukus backed the car up and drove south on Avers. As the police car approached the group, Calvin Wilder ran through an opening in the fence and northeast through the vacant lot. The defendants ran through a gate in the fence and into the vacant lot as Eichler and Keating jumped out of the car while it was still moving. At Eichler's direction, Daukus sped around the block to cut off the defendants' flight.

Bradford, Woods and Michael Smith were about 20 feet in front of Green Smith and were running on a northeast diagonal through the lot. Green Smith was running down the concrete gangway situated along the side of the building. While running down this concrete walk, Green Smith threw a large brown bag to the ground. He then ran into the vacant lot, following the other three defendants. Eichler, who was in front of Keating, started to pick up the brown bag, but Keating called out that he would retrieve it. In the middle of the lot, Michael Smith broke away from the group and ran south toward the rear of the building. Eichler pursued Bradford, Woods and Green Smith, and Keating chased Michael Smith. As Bradford, Woods and Green Smith reached the back of the vacant lot near the alley behind Avers Street, the police car driven by Daukus came racing toward them. The three defendants stopped, and Woods dropped a paper bag to the ground. As Officers Daukus and Jackson were getting out of the car, Keating called out that he had "the dope." Eichler retrieved the bag dropped by Woods, looked inside and saw that it contained several foil packets. He then told Daukus and Jackson to hold the defendants because "[they had] the dope" and indicated that he was going to assist Officer Keating.

Officer Daukus searched Bradford and recovered a plastic bag containing 50 foil packets from his jacket pocket. During this search, Calvin Wilder appeared on the scene and severely berated the officers for troubling his friends. Wilder was thereafter arrested for disorderly conduct. As Eichler was walking back toward the building, Keating came out of the door to the enclosed back porch with Michael

Smith in handcuffs. All of the defendants were subsequently taken to the police station.

On direct examination, Sergeant Eichler testified that Green Smith was holding the large brown bag when Eichler first saw him standing in the doorway of the building. Eichler stated further that the gangway was about 125 feet long and ran the length of the building. Eichler estimated that it took about 30 or 40 seconds to run from the front of the gangway to the back, and it took the police officers in the car about one minute to get around to the alley at the back of the vacant lot. Eichler indicated, however, that he did not time these events with a stopwatch at the time of the incident.

Eichler also testified that he was familiar with the general area where this incident occurred, had observed illegal activities in the area and had made hundreds of arrests there in the past. He indicated that he had previously arrested Gabriel Smith, Michael Smith's brother and Green Smith's son, in the building outside which the defendants had been standing. Eichler obtained the address of the building from the earlier arrest report and listed it as 2245 South Avers. When Eichler saw Keating come out of the building with Michael Smith in custody, Keating was holding the bag that had been dropped on the gangway by Green Smith as well as a bag dropped by Michael Smith. Eichler and Keating returned to the alley with Michael Smith, and all of the defendants were taken to the police station.

On cross-examination, Eichler acknowledged that he had engaged in several conversations with Officers Keating and Daukus about the case. He also stated that when he spoke with the prosecutor about the case prior to trial, the other officers were present. Eichler did not have a private interview with the prosecutor prior to testifying. He indicated further that he had twice returned to the scene with Officer Keating and with two prosecuting attorneys.

Eichler had reviewed the arrest and case reports of this incident and made no changes or amendments. He confirmed that these reports did not include many of the specific details of the incident which he provided in his testimony. Specifically, the reports did not reflect that the officers had seen a group of people standing on both sides of Avers as they drove down Cermak. There was no indication that Eichler saw Green Smith holding the large brown bag while Smith was standing in the doorway. There was no list of the order in which the defendants ran into and through the vacant lot. The reports did not reflect that Green Smith dropped a bag in the gangway or that Keating stated that he would retrieve it. The reports did not indicate

whether any of the officers saw the defendants with narcotics or which officer recovered narcotics from which defendant. There was no indication that a fifth individual, Calvin Wilder, ran through a hole in the cyclone fence. The reports did not reflect that the police car approached the defendants or cut them off in the alley. There was no indication that the address of the building had been obtained from an earlier arrest report.

Although Eichler testified that Green Smith dropped the bag near the alley, the arrest report reflected that the bag was dropped about eight feet into the gangway. The arrest report for Calvin Wilder reflected that Wilder was stopped at the same time as the other defendants and did not indicate that he approached the group later and was subsequently arrested. Eichler explained that these reports were merely summaries of the facts of the incident and arrests.

Officer Keating's testimony substantially corroborated Sergeant Eichler's account of the incident. He further indicated that he chased Michael Smith as he ran from the vacant lot back toward the building. As Smith approached the building, he dropped a brown paper bag to the ground. Keating retrieved the bag and followed Smith into the enclosed rear porch of the building. The officer stopped Smith as he was running up the porch stairs. Keating then opened the large brown bag that had been dropped on the gangway by Green Smith and saw that it contained hundreds of foil packets and a large amount of money (over $4,000). After he called to the other officers that he had "the dope," Keating looked into the bag dropped by Michael Smith and saw that it contained two clear plastic bags, each holding several foil packets. Keating placed Smith under arrest, handcuffed him and conducted a pat-down search. As Keating and Smith were walking back down the stairs, Eichler approached them. Keating then gave Eichler the large bag that had been dropped by Green Smith, and they proceeded to the alley where the other defendants were being held by Officers Daukus and Jackson.

On cross-examination, Keating admitted that he had previously read the arrest and case reports pertaining to this incident and did not make any changes or amendments. He acknowledged that these reports did not reflect that the officers were assigned to provide security for job program sites or that they had observed a group of people standing on the corners of Avers and Cermak before they saw the defendants standing further down the block. The reports also did not indicate that the address of the building had been obtained from an earlier arrest report. The reports did not state that Green Smith was holding a bag as he stood in the doorway, that Keating later retrieved

it or that he turned this bag over to Eichler after Michael Smith was arrested. The reports did not indicate that Keating called out that he had "the dope" or that Michael Smith was arrested in the building's enclosed back porch. Rather, the arrest report indicated that Smith was arrested in the yard behind the building. Although the report reflected that Green Smith dropped the large bag near the alley, Keating testified that Smith dropped the bag about 10 feet into the gangway. Keating acknowledged that he had discussed his testimony with Sergeant Eichler and with the prosecutors prior to trial, but he said he had not returned to the scene after the arrests.

Officer Daukus testified to substantially the same facts as did Sergeant Eichler and Officer Keating. He stated further that after Eichler and Keating jumped out of the car, he sped down Avers, across a vacant lot and back north in the alley to cut off the flight of the defendants. When he reached the back of the vacant lot through which the defendants had run, he saw Bradford, Woods and Green Smith. Daukus and Jackson got out of the car and heard Keating call out that he had "the dope." Eichler told Daukus and Jackson to hold the three defendants. Believing that the defendants had been placed under arrest, Daukus searched them. He recovered a plastic bag containing 50 foil packets from a pocket in Bradford's jacket. After these defendants had been searched, Daukus saw Keating and Michael Smith come from the area behind the building. He also saw Eichler carrying the large brown bag that Green Smith had been holding as he stood in the doorway. Calvin Wilder appeared on the scene and was subsequently arrested.

On cross-examination, Daukus admitted that he had read and signed the arrest and case reports pertaining to this incident but did not make any changes or amendments. He acknowledged that the police reports did not reflect that Green Smith had a bag in his hand as he stood in the doorway or that Daukus had recovered narcotics from any of the defendants. Daukus testified further that these reports were merely summaries of the facts of the incident and arrests.

Daukus also stated that he did not see Woods drop a bag near the back of the vacant lot. When Daukus saw Eichler come from the vacant lot, Eichler had the large bag that Green Smith had been holding in the doorway. Subsequently, Keating handed something to Eichler who was then holding "a couple of paper bags."

The parties stipulated that the bag alleged to have been dropped by Green Smith contained 15 clear plastic bags. Of those 15 bags, 13 held 50 foil packets, one held 46 foil packets and one held 51 foil packets. There were 747 foil packets, containing a total of 126.19

grams of heroin. The bag also contained a quantity of United States currency. The parties stipulated further that the bag alleged to have been dropped by Michael Smith contained two clear plastic bags, each holding 50 foil packets and totaling 17.27 grams of heroin. The bag alleged to have been dropped by Woods contained two plastic bags, each holding 50 foil packets and totaling 16.54 grams of heroin. The clear plastic bag alleged to have been recovered from Bradford during the search contained 50 foil packets totaling 9.98 grams of heroin. All of the bags described above were admitted into evidence.

Thereafter, the court denied each defendant's motion for a directed finding, concluding that the inconsistencies in the officers' testimony and the omissions from the police reports were minimal and were to be expected because the incident occurred very quickly and involved several officers and defendants. The court also denied Bradford's motion to suppress physical evidence. Upon mutual request by the parties, the court agreed to and did personally view the scene of the incident.

Testifying for the defense, Mark Woods stated that he was not related to defendant Luther Woods but had known him for nine years. Mark Woods had known the other three defendants all of his life, and he knew Gabriel Smith. He lived at 2225 South Hamlin, which was in the block that was immediately east of where the defendants were arrested. About 9:30 a.m. on April 14, 1986, Mark Woods left his car to be repaired at a body shop located in the alley between Avers and Hamlin Streets. He then walked down the alley toward his home, carrying a large bag of dog food on his shoulder. Mark Woods saw Luther Woods, Green Smith, Donald Bradford and Calvin Wilder walking in the alley north of Gabriel Smith's house and ran up to them. Michael Smith was not with the group at that time.

Thereafter, a police car, proceeding north through the alley, pulled up behind them. The police car was traveling at about 35 miles per hour. The officers in the car allowed Mark Woods to continue walking, but told the other four men to put their hands on the car. When he reached the end of the alley, Mark Woods looked back and saw the police officers searching the four men with whom he had been walking. He did not see anyone holding or dropping a brown paper bag and did not see anyone run through the vacant lot next to Gabriel Smith's house. He returned to the scene about five minutes later and saw that his companions were still standing by the car and were handcuffed. Sergeant Eichler had a brown plastic bag with handles which did not look like the bags that were before the court. Mark Woods also saw Michael Smith walking toward the area with another police officer.

Woods never heard Calvin Wilder say anything to the officers. Mark Woods admitted that he had discussed the case with Bradford, Michael Smith and the defense attorneys prior to trial.

Defendant Donald Bradford testified that about 9:30 a.m. on April 14, 1986, he was in the lot immediately to the north of Gabriel Smith's house which was located at 2241 South Avers. As he was standing at the back of the lot near the alley, Luther Woods and Green Smith came out of the back door to the building's enclosed rear porch and joined him. Calvin Wilder then walked from the front of the vacant lot to the back, and the four men walked north in the alley toward Cermak Road. They were joined by Mark Woods, but Michael Smith was not with the group at this time.

Bradford testified further that when the group reached the second vacant lot to the north of Gabriel Smith's house, a police car drove north in the alley. Mark Woods continued walking, but the other four men stopped. The two officers in the car conducted pat-down searches of these four. Thereafter, Sergeant Eichler, with a dark plastic bag in his hand, came through the vacant lot to the south which was next to Gabriel Smith's house. The bag held by Eichler did not resemble the paper bags that were before the court. Eichler told the other officers to handcuff Bradford, Green Smith, Luther Woods and Calvin Wilder. Wilder, who was hollering at the officers and asking why they were troubling his friends, was arrested. Thereafter, Officer Keating brought Michael Smith from the area of the vacant lot to the south and next to Gabriel Smith's house. This officer was not carrying a paper bag in his hand. Bradford denied that a plastic bag containing foil packets was recovered from him during the search. He also denied that anyone had run through the vacant lot or dropped any paper bags to the ground.

Michael Smith testified that he was the son of Green Smith and his brother, Gabriel Smith, lived in the second-floor apartment of the three-story building at 2241 South Avers. He arrived at his brother's house at about 8:45 a.m. on April 14, 1986, and his father arrived about 15 minutes later. Around 9:30 a.m. Green Smith left the apartment through the back door. Shortly thereafter, a woman came downstairs and said that "they had his father." Michael then looked out of a window in the enclosed back porch and saw an unmarked police car. He also saw Calvin Wilder, Luther Woods, Donald Bradford and Green Smith being searched by three police officers.

After he had looked out of the window for about five minutes, a police officer ran up the stairs of the back porch with his gun drawn. The officer stuck the gun in Michael Smith's side, kicked him in the

midsection, handcuffed him and placed him under arrest. Smith was then taken down to the alley where his father was being held with Bradford, Woods and Calvin Wilder. There, he saw a dark plastic bag sitting on the hood of the police car. Smith stated that he never left the house and was not running outside when the officer came toward him. Michael Smith indicated further that his father, Green Smith, had a "bad leg" and could not run very well. Michael Smith denied having possession of a brown bag on the day in question. He also denied seeing any foil packets and denied that his father had a brown bag that day.

In rebuttal, the State introduced a certified copy of conviction for Michael Smith and two certified copies of conviction for Donald Bradford. The parties stipulated that Donald Bradford had been convicted in 1979 by a Federal court for conspiracy to distribute narcotics. This evidence was admitted without objection.

During closing arguments, the trial judge commented that while viewing the scene, he was told that the building at 2241 South Avers had new numbers indicating its address and that the numbers were not on the building at the time of the incident on April 14, 1986. Following closing arguments, the trial court held that the omissions from the police reports and the inconsistencies in the officers' testimony were minimal. The court further found that the testimony of the defendants was not credible and thereafter found all of the defendants guilty as charged. The State's motion to revoke the bond of Donald Bradford and of Michael Smith was granted, and the court ordered that presentence investigation reports be prepared.

The defendants subsequently filed motions for a new trial. During argument on these motions, counsel for Green and Michael Smith pointed out that the court had relied upon the out-of-court statement of a police investigator that the building at 2241 South Avers had new numbers indicating its address. In response to this argument, the court noted that this information was not included in its findings at the conclusion of the trial and specifically held that the information was not significant or pivotal in its conviction of the defendants. After additional argument on the motions for a new trial, the court found that there were no substantial inconsistencies in the officers' testimony. Taking note that the incident occurred very quickly, the court held that that it could not have expected the testimony of the officers involved to be precisely identical. The court found the defendants' theory that they were the unwitting victims of a conspiracy by the police officers to be unbelievable and not supported by the credible evidence presented at trial. Each defendant's motion for a new

trial was denied.

At the sentencing hearing, presentence investigation reports were distributed, and the parties stipulated that Green Smith had been convicted by a Federal court in 1980 of continuing criminal enterprise and conspiracy to distribute narcotics. It was also stipulated that Donald Bradford had been previously convicted by a Federal court of conspiracy to distribute narcotics. The parties stipulated further that Luther Woods also had been previously convicted by a Federal court of conspiracy to distribute narcotics and of distribution of narcotics. The State requested that Green Smith, Luther Woods and Donald Bradford be sentenced to enhanced prison terms in accordance with section 408 of the Controlled Substances Act. (Ill. Rev. Stat. 1985, ch. 56½, par. 1408.) The State sought a Class X sentence for Michael Smith.

Counsel for Michael Smith argued in mitigation that his only prior conviction was for possession of a stolen motor vehicle in 1985 for which he received a sentence of 18 months' probation. Counsel also pointed out that Smith was 24 years old, married and had been a resident of Illinois all of his life.

Counsel for Green Smith asked the court to consider the contents of the presentence investigation report and argued that Green Smith was not a violent person, was married, was 41 years old and a Chicago resident. Counsel also argued that the provisions of section 408 of the Controlled Substances Act (Ill. Rev. Stat. 1985, ch. 56½, par. 1408) did not apply in the instant case.

Counsel for Donald Bradford noted in his argument that Bradford had a sixth-grade education and had been gainfully employed as a truck driver, carpenter and brick mason, was married and had a 10-year-old daughter and a one-month-old daughter. Counsel then argued that although Bradford had previously been convicted of a Class 3 felony in Illinois, incarceration for an extended period of time would work a great hardship on his family.

Finally, counsel for Luther Woods argued that his client was 32 years old, a product of a broken home, had lived with his mother, and had no father-figure while he was growing up.

The trial court found that prior Federal convictions were included within the clear meaning of the provisions of section 408(b) of the Controlled Substances Act (Ill. Rev. Stat. 1985, ch. 56½, par. 1408(b)), and therefore, that section was applicable in the instant case. After considering the relevant statutory factors and the arguments of counsel in aggravation and in mitigation, the court sentenced the defendants as follows: Green Smith received a term of 40 years' im-

prisonment; Luther Woods received a term of 40 years' imprisonment; Michael Smith received a term of 20 years' imprisonment; and Donald Bradford received a term of 14 years' imprisonment. As noted above, defendants have now appealed the judgments of conviction and the sentences imposed.

Defendants initially contend that their convictions should be reversed because the testimony of the three police officers was rehearsed, conflicting, impeached by omissions and contradictions in the police reports, and contrary to the physical evidence at trial.

Defendants argue that the inconsistencies in the testimony and the details omitted from the police reports create reasonable doubt of their guilt. These inconsistencies and omissions related to (1) whether the officers were assigned to provide security for summer job program sites; (2) whether the officers saw a large group of people standing on both sides of Avers as they drove down Cermak; (3) whether Green Smith was holding a large brown bag while he stood in the doorway; (4) whether the officers observed Calvin Wilder run through a hole in the cyclone fence as they approached in the police car; (5) whether the officers testified differently concerning the order in which the defendants ran down the gangway and through the vacant lot; (6) whether Green Smith dropped the bag 8 or 10 feet into the gangway or near the alley; (7) whether Officer Keating told Eichler that he would retrieve the bag dropped by Green Smith; (8) whether any of the officers observed the defendants with narcotics; (9) which officer recovered narcotics from which defendant; (10) whether the address of the building had been obtained from an earlier arrest report; (11) whether Calvin Wilder was stopped at the same time as the other defendants or approached the group later and only then was arrested for disorderly conduct; (12) whether Keating or Eichler had possession of the bag dropped by Green Smith when Daukus and Jackson arrived in the alley behind the vacant lot; (13) whether Michael Smith was arrested in the yard behind the building or on the stairs of the enclosed back porch; (14) whether Keating called out that he had "the dope"; (15) whether Keating gave Eichler the large bag that had been dropped by Green Smith; (16) whether Luther Woods dropped a bag near the back of the vacant lot; (17) whether Officer Daukus recovered narcotics from Donald Bradford; and (18) whether Eichler and Keating returned to the scene after the arrests and prior to trial.

Minor inconsistencies in testimony do not constitute grounds for reversal of a criminal conviction (*People v. Scott* (1987), 152 Ill. App. 3d 868, 872, 505 N.E.2d 42, 45; *People v. Daniels* (1984),

129 Ill. App. 3d 894, 900, 473 N.E.2d 517, 522; *People v. Wright* (1972), 3 Ill. App. 3d 829, 833, 279 N.E.2d 398, 401), and the effect of minor testimonial discrepancies upon the credibility of the witnesses is a matter for the trial court's determination. (*People v. Morgan* (1963), 28 Ill. 2d 55, 190 N.E.2d 755; *People v. Lemon* (1966), 70 Ill. App. 2d 413, 218 N.E.2d 8.) In the instant case, the inconsistencies in the testimony and the omissions from the police reports were fully explored during defense counsel's cross-examination of the State's witnesses. The trial court considered these discrepancies but concluded that they were minor and were to be expected because the incident occurred very quickly and involved several officers and defendants.

In a bench trial, it is within the province of the trial court to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts therein, and to render its decision accordingly. (*People v. Purnell* (1984), 126 Ill. App. 3d 608, 620, 467 N.E.2d 1160, 1169.) Where the evidence is conflicting, it is the prerogative of the trier of fact to ascertain the truth. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Purnell* (1984), 126 Ill. App. 3d 608, 467 N.E.2d 1160.) The trial court specifically found that the testimony of the State's witnesses was credible. The court also held that the theory posited by defendants was unbelievable and was not supported by the evidence presented at trial. When a defendant waives trial by jury and offers an explanation of his conduct, the plausibility of that story is to be determined by the trial judge, and the trial judge, as trier of fact, is entitled to disbelieve the explanation offered. *People v. Lebron* (1987), 161 Ill. App. 3d 815, 821, 515 N.E.2d 312, 315; *People v. Kaprelian* (1972), 6 Ill. App. 3d 1066, 1072, 286 N.E.2d 613, 618.

■ The defendants also contend that the testimony of the officers was rehearsed. Although Eichler and Keating acknowledged that they had discussed the case with the other officers and with the prosecutors, there is no evidence that their testimony was altered or colored by emphasis or suggestion. (See *People v. McGuirk* (1969), 106 Ill. App. 2d 266, 245 N.E.2d 917, *cert. denied* (1969), 396 U.S. 972, 24 L. Ed. 2d 439, 90 S. Ct. 459.) Defendants assert that the officers' testimony was influenced by the prosecutor or by the other officers and rely on *People v. Pendleton* (1979), 75 Ill. App. 3d 580, 394 N.E.2d 496. In that case, the complaining witness testified on a Friday but was unable to identify the defendants as her attackers. The prosecutor met with her during the weekend recess to "review and discuss" her testimony. When the trial resumed the following Monday, the com-

plainant positively identified the defendants as the men who had attacked her. The court found that the testimony of the complaining witness was changed drastically as a result of her lengthy discussion with the prosecutor. There is no evidence in the present case that the testimony of the officers was influenced or changed as a result of a discussion with the prosecutor or with the other officers. Thus, *People v. Pendleton* is factually distinguishable from the instant case and is not controlling.

■ Defendants assert further that the testimony of the State's witnesses should be rejected because the prosecutor failed to call Officer Arthur Jackson during the trial. This assertion is without merit. The testimony of a single law-enforcement officer is sufficient to support a conviction in a narcotics case. (*People v. Garcia* (1981), 100 Ill. App. 3d 302, 304, 426 N.E.2d 1116, 1117-18; *People v. Grayson* (1980), 89 Ill. App. 3d 766, 772, 411 N.E.2d 1177, 1181.) In the case at bar, Sergeant Eichler and Officers Keating and Daukus testified that the four defendants ran from the area as the police car approached. Eichler testified that Green Smith and Luther Woods discarded bags containing narcotics. Keating testified that Green Smith and Michael Smith discarded bags containing narcotics. Daukus testified that a bag containing narcotics was recovered during a search of Donald Bradford's person. It was unnecessary for the State to call Officer Jackson to further corroborate the accounts given by the other three officers. *Garcia*, 100 Ill. App. 3d 302, 426 N.E.2d 1116.

■ Defendants also contend that the testimony of the officers must be rejected because it was contrary to the "laws of physics." Specifically, they refer to the fact that Sergeant Eichler stated it took between 30 and 40 seconds to run from the front of the vacant lot to the back, and it took about one minute for the police car driven by Daukus to reach the south end of Avers, cross another vacant lot and proceed north up the alley to meet the defendants as they were attempting to escape. As previously noted, the trial court personally viewed the scene and heard all of the evidence. Moreover, these discrepancies were fully explored during defense counsel's cross-examination of the State's witnesses. (*People v. Bell* (1972), 53 Ill. 2d 122, 125-26, 290 N.E.2d 214, 216; *Scott*, 152 Ill. App. 3d at 872, 505 N.E.2d at 45.) Yet, the trial court found the testimony of the officers credible and held that the inconsistencies were minor and to be expected because the incident occurred very quickly and involved several defendants and officers. We cannot say this evidence was contrary to the "laws of physics" or that this evidence raises a reasonable doubt as to defendants' guilt.

■ We next consider defendant Bradford's assertion that the court erred in denying his pretrial motion to quash his arrest and to suppress evidence against him. Bradford contends that the trial court's ruling was erroneous because Officer Daukus did not have probable cause to arrest or search him. This argument is unpersuasive. On a motion to suppress evidence the defendant has the burden of proving the search and seizure were unlawful. (Ill. Rev. Stat. 1985, ch. 38, par. 114—12(b); *People v. Hoskins* (1984), 101 Ill. 2d 209, 461 N.E.2d 941.) The standard of review on a motion to suppress is whether the trial court's ruling was manifestly erroneous. *People v. Galvin* (1989), 127 Ill. 2d 153, 535 N.E.2d 837; *People v. Tribett* (1981), 98 Ill. App. 3d 663, 424 N.E.2d 688; *People v. Brown* (1980), 88 Ill. App. 3d 514, 410 N.E.2d 505.

■ ■ The constitutional safeguards against unreasonable searches and seizures do not prohibit all searches made without a warrant, but only those which are unreasonable. (*People v. Kelly* (1979), 76 Ill. App. 3d 80, 394 N.E.2d 739; *People v. Jefferies* (1972), 6 Ill. App. 3d 648, 285 N.E.2d 593.) A warrantless search is justified where there is probable cause to believe that a crime has been committed and that a search of a particular place or thing will disclose evidence, fruits of the crime, or is necessary to protect the police officer. (*Kelly*, 76 Ill. App. 3d at 84, 394 N.E.2d at 743; *People v. Hering* (1975), 27 Ill. App. 3d 936, 327 N.E.2d 583.) The reasonableness of a search must be judged upon the particular facts and circumstances surrounding the search. In order to decide if the officer had probable cause to conduct a search, the crucial question is whether the facts available to the officer at the moment of the stop would have caused a reasonable person to proceed in the same manner. *People v. Worlow* (1982), 106 Ill. App. 3d 112, 435 N.E.2d 795; *People v. Watts* (1981), 93 Ill. App. 3d 420, 417 N.E.2d 247.

■ Probable cause exists where the police have knowledge of facts which would lead a reasonable person to believe that a crime has occurred and that it has been committed by the defendant. (*People v. Wright* (1985), 111 Ill. 2d 128, 490 N.E.2d 640; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 461 N.E.2d 347.) The determination of probable cause to search is to be made after examination of the totality of the circumstances. *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.

■ The probability of criminal activity, rather than proof beyond a reasonable doubt, is the standard for determining whether probable cause is present. Whether the necessary probability exists is governed not by technical, legal rules, but rather by commonsense consider-

ations that are factual and practical. *Brinegar v. United States* (1949), 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302; *People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.

Facts sufficient to establish probable cause need not be sufficient to establish guilt beyond a reasonable doubt, and probable cause may be founded upon evidence which would not be admissible at trial. (*Kelly*, 76 Ill. App. 3d at 84, 394 N.E.2d at 739; *People v. Blitz* (1977), 68 Ill. 2d 287, 369 N.E.2d 1238, *cert. denied* (1978), 435 U.S. 974, 56 L. Ed. 2d 68, 98 S. Ct. 1622.) In determining whether the officer had probable cause, the officer's factual knowledge, based on his prior law-enforcement experience, is relevant. *People v. Lee* (1986), 151 Ill. App. 3d 510, 502 N.E.2d 399; *People v. Smith* (1983), 95 Ill. 2d 412, 447 N.E.2d 809.

In ruling on Bradford's pretrial motion, the trial court noted that the evidence had established Donald Bradford, Luther Woods and Michael Smith fled the scene in close proximity to each other, followed by Green Smith and chased by Sergeant Eichler and Officer Keating. A bag containing narcotics was dropped by Green Smith, and the nature of the contents of this bag was known to Sergeant Eichler prior to the stop and search of any of the defendants. Considering the flight of the defendants, the court concluded that it was reasonable for Eichler to order Daukus to hold the defendants and that a search incident to the arrest would have been reasonable. Indicating that the issue was whether the actions of Eichler and Daukus were reasonable, the court determined that there was sufficient evidence to support this conclusion. Accordingly, the court denied Bradford's motion to suppress physical evidence.

The record indicated that Daukus was aware that the defendants fled from the scene as the police car approached. Eichler told Daukus to hold the three defendants because "[they had] the dope," and Daukus heard Keating call out that he had "the dope." This case is, therefore, analogous to *Peters v. New York* (1968), 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889, where the Supreme Court held that a suspect's flight at the approach of strangers or law-enforcement officers was strong indicia of *mens rea*. When coupled with the officer's specific knowledge relating the suspect to evidence of crime, the suspect's flight will provide probable cause for arrest. See also *People v. Beall* (1976), 42 Ill. App. 3d 452, 355 N.E.2d 756; *People v. Cribbs* (1972), 8 Ill. App. 3d 750, 291 N.E.2d 326; *People v. Staples* (1971), 1 Ill. App. 3d 922, 275 N.E.2d 259.

The evidence clearly established that all of the defendants fled the scene and were running together as the police car approached. Brad-

ford's flight coupled with Daukus' knowledge that narcotics had been recovered during the pursuit of the defendants provided probable cause for the officer to search Bradford. Consequently, we find no error in the trial court's denial of Bradford's pretrial motion.

Next, defendants Green Smith, Luther Woods and Donald Bradford allege that the trial court erred in sentencing them to enhanced prison terms because their respective prior convictions were not alleged in the indictment or proved at trial. This argument is unpersuasive. Section 408 of the Controlled Substances Act (Act) provides as follows:

"(a) Any person convicted of a second or subsequent offense under this Act may be sentenced to imprisonment for a term up to twice the maximum term otherwise authorized, fined an amount up to twice that otherwise authorized, or both.

(b) For purposes of this Section, an offense is considered a second or subsequent offense, if, prior to his conviction of the offense, the offender has at any time been convicted under this Act or under any law or the United States or of any State relating to controlled substances." Ill. Rev. Stat. 1985, ch. 56½, par. 1408.

This section deals exclusively with sentencing and describes the circumstances under which an enhanced penalty may be imposed for a violation of the Act. It is, therefore, similar to the extended-term provision of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2). Section 408 does not make the prior offense an element of the crime charged and does not mandate that an enhanced penalty be imposed. Because imposition of an enhanced penalty under this section is discretionary, the prior offense need not be charged in the indictment or proved at trial. See *People v. Palmer* (1984), 104 Ill. 2d 340, 472 N.E.2d 795; *People v. Racinowski* (1979), 78 Ill. App. 3d 954, 397 N.E.2d 932; *People v. Phillips* (1978), 56 Ill. App. 3d 689, 371 N.E.2d 1214.

Defendants further argue that the trial court abused its discretion in imposing excessive sentences upon each of them. Defendants claim that the trial court was "adversely predisposed to the defendants" and failed to consider their rehabilitative potential. The evidence in the record does not support this assertion. The sentence for each of the defendants was within the applicable statutory limits.

It is recognized that in considering the propriety of punishment a court of review must give great weight to the judgment of the trial court. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v.*

*Bergman* (1984), 121 Ill. App. 3d 100, 458 N.E.2d 1370.) The imposition of a sentence is a matter of judicial discretion and, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. Additionally, the trial judge is normally in a better position to determine the punishment to be imposed than is a court of review. *Perruquet*, 68 Ill. 2d at 153, 368 N.E.2d at 883; *People v. Butler* (1976), 64 Ill. 2d 485, 490, 356 N.E.2d 330, 333.

■■■ A reasoned judgment as to the proper sentence to be imposed must be based upon the particular facts and circumstances of each individual case. (*Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884; *People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168.) Such a judgment depends upon many factors, including the gravity of the offense and the circumstances of commission, the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, age, and criminal history. *Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884; *People v. Duncan* (1981), 97 Ill. App. 3d 896, 424 N.E.2d 67; *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 364 N.E.2d 491.

■■■ The sentencing judge is charged with the difficult task of fashioning a sentence which would strike the appropriate balance between protection of society and rehabilitation of the offender. (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541, 548; *Bergman*, 121 Ill. App. 3d at 109, 458 N.E.2d at 1378.) Yet, the objective of restoring the offender to useful citizenship is to be accorded no greater consideration than that which establishes the seriousness of the offense. (*People v. Waud* (1977), 69 Ill. 2d 588, 596, 373 N.E.2d 1, 4; *Bergman*, 121 Ill. App. 3d at 198, 458 N.E.2d at 1378.) The trial court is not required to detail for the record the process by which it concluded that the penalty imposed was appropriate. *La Pointe*, 88 Ill. 2d at 493, 431 N.E.2d at 349; *Bergman*, 121 Ill. App. 3d at 198, 458 N.E.2d at 1378.

■■■ At the sentencing hearing, the trial court had before it the presentence investigation reports and heard defense counsel's statements in support of the defendants' rehabilitative potential. Prior to imposing the sentence, the trial judge stated that he had considered the presentence investigation reports, the relevant statutory factors, the evidence presented at trial, the factors in aggravation and in mitigation and the arguments of counsel. It is clear, therefore, that the court was fully aware of defendants' past records, their family situations and their personal traits. Yet, these considerations had to be balanced against the seriousness of the offenses. Upon review of the record, it is clear that the trial judge properly considered all relevant

factors, including the defendants' rehabilitative potential, in his sentencing decisions. Thus, it does not appear that the penalties reflect an abuse of the trial court's discretion. *People v. Younger* (1986), 112 Ill. 2d 422, 494 N.E.2d 145.

■■ ■ Finally, defendants contend that they were deprived of due process by the trial court's consideration of information not presented at trial but obtained while viewing the scene. Specifically, defendants refer to the trial court's statement during closing argument that the trial judge was told, while viewing the scene, that there were new numbers indicating the address of the building at 2241 South Avers and that those numbers were not on the building at the time of the incident and arrests. Defendants argue that because the person making this statement was not subject to cross-examination, the court's consideration of the information constituted a denial of due process. This claim was rejected by the trial court during the hearing on defendants' motions for a new trial. At that time, the court stated that no significance was attached to the information about new numbers on the building. Thus, this fact was not crucial and was not relied upon by the court in finding defendants guilty.

In a bench trial, it is presumed that the trial court has considered only competent evidence in reaching its finding, and this presumption may be rebutted only when the record affirmatively shows the contrary. (*People v. Gilbert* (1977), 68 Ill. 2d 252, 258, 369 N.E.2d 849, 852.) In the instant case, the trial judge specifically stated that he attached no significance to the statement about new numbers on the building. Thus, we find no basis for the defendants' claim that the court relied upon incompetent evidence in finding them guilty.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed.

Judgments affirmed.

EGAN, P.J., and QUINLAN, J., concur.