THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ANIBAL MURILLO, Defendant-Appellant.

First District (5th Division)   No. 1—88—3653

Opinion filed February 7, 1992.

Anthony Pinelli and Thomas M. Breen, both of Martin & Breen, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kathy A. Dietz, and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Defendant Anibal Murillo was indicted for murder and found guilty by a jury of voluntary manslaughter and sentenced to 15 years' imprisonment. He appeals, contending: (1) the State failed to prove that defendant's use of deadly force to defend himself from bodily harm and an attempted robbery was unreasonable; (2) he was prejudiced by the prosecution's use of the nickname "Dillinger" to identify defendant throughout the trial; (3) he was denied a fair trial by the prosecutor's allegations that he had created a phony defense; and (4)

the imposition of the maximum 15-year sentence was an abuse of discretion. For the reasons set forth below, we affirm.

On June 22, 1987, the defendant Anibal Murillo shot and killed Roberto "Beto" Romero in a gangway between 2845 and 2847 West 21st Street in Chicago. The defendant claimed it was self-defense. The following evidence was introduced at defendant's trial for murder.

Gregory Carrizales testified that at about 11 p.m. on the night of the incident, he was on the front steps of 2855 West 21st Street in Chicago, talking with his friend Rudy Romero (the nephew of Roberto Romero), when he heard a chain link fence rattling. He described the noise as though someone was trying to jump over the fence or someone was getting pushed into it.

Turning his head to the east, he saw defendant, whom Carrizales knew only by the nickname "Dillinger," 50 to 60 feet away shooting a gun into a gangway between two houses. When Carrizales first saw him, the defendant was taking steps back out of the gangway. Defendant fired three shots, the second two in faster succession than the first. Carrizales said that the defendant was holding the gun with both arms extended forward. After firing the shots, defendant turned towards Carrizales and Rudy, and Carrizales ran into the house. When Carrizales went back outside, he saw Rudy and Nancy Godinez, who lived at 2851 West 21st Street, standing in the gangway where they had seen the shots fired. Rudy told him that his (Rudy's) uncle had been shot.

Nancy Godinez testified that she was in the kitchen of her home when she heard three shots fired, the second two closer together than the first. She looked out her front window and saw a man holding what she believed to be a gun running down the gangway to her back yard. At the time, she did not know who the man was, but noticed that he had a distinctive way of moving. She later remembered that it was the defendant, whom she knew as "Dillinger," who moved like that.

When she went outside, she saw "Beto" Romero lying in the gangway, bleeding, and calling for his mother. Godinez ran across the street and told "Beto's" mother that her son had been shot. When Godinez returned to the gangway a minute to a minute and a half later, Rudy Romero and Carrizales were there.

She noticed a lighter with a round metal tip on it by the victim's hand. (Although the lighter was evident on several police photos, it was not recovered by police evidence technicians or admitted into evidence at trial.) She also saw several tattoos on "Beto's" arms. Two

were symbols of the Mighty Kents gang, and another was a marijuana leaf. Prior to this incident, Godinez had seen the victim with a gun two or three times.

Rudy Romero, the nephew of the victim, testified that he was with Gregory Carrizales at about 10:30 p.m. on June 22, 1987, sitting on the front steps of his mother's house at 2855 West 21st Street. The victim came across the street to ask Rudy when he was coming home. Rudy saw the defendant looking out from a gangway, observing Rudy and his uncle, and then turning back into the gangway. No words were exchanged. About five minutes later, the victim pulled out some papers to roll a reefer, and walked down the street to a gangway a few houses away.

Rudy next saw the defendant come out of a vacant lot next to the house where Rudy and Carrizales were. The defendant walked towards where the victim was. Twenty or thirty seconds later Rudy heard a gunshot, and when he turned in the direction of the noise, he saw the defendant pointing the gun into the gangway and firing. Rudy could not see his uncle at this time. Prior to hearing the gunshots, Rudy heard the sound of a chain link fence.

When Rudy arrived at the gangway where his uncle was lying, Nancy Godinez was there. Rudy stayed with his uncle until the police arrived, 20 to 25 minutes later. He told the police that "Dillinger," the only name by which he knew the defendant, had shot his uncle.

At the time of trial, Rudy was living at the Audy home because of a pending robbery charge against him. Approximately four months prior to trial in the instant case, Rudy was arrested on a homicide charge, but the homicide charges were dropped when he agreed to turn State's evidence in that case.

Officer Frank Luera of the Chicago police department testified that he arrested defendant at defendant's home a block away from the incident less than an hour after the shooting. Another officer, Thomas Sherry, testified that defendant told the police he had no knowledge of the shooting, that he did not participate in it, and that he was playing basketball with a friend at a playground at the time of the shooting. Shortly after arriving home, the police arrived and arrested him. Defendant also told the police that some days before the shooting, "Beto" Romero had taken a gold chain or medallion from him.

Thaddeus Melko, an evidence technician with the Chicago police department, testified that he was called to the scene of the shooting shortly after midnight. Melko searched the victim and the scene for possible evidence. He did not find any guns or other weapons in the

victim's possession or anywhere in the adjacent area. At the police station, Melko performed a gunshot residue (GSR) test on defendant, which was later analyzed by Dr. Krishen Kaishtha.

Dr. Krishen Kaishtha testified as a qualified expert that on May 19, 1988, he received a GSR kit for testing. The results of that test were consistent with someone firing or handling a weapon with his right hand while holding his left palm against the weapon.

Dr. Barry Lifschultz, a forensic pathologist, testified that an autopsy of the victim revealed that he had been shot three times. One bullet entered through the back of the right shoulder, proceeded through the muscles of the upper back, and was recovered beneath the skin at the back of the left shoulder. Another bullet perforated the skin of the middle of the right side of the victim's back, penetrated and perforated the heart and left lung, and was recovered from beneath the skin of the left side of his chest. The course of this bullet was from back to front, right to left, and upwards. The third bullet (although not necessarily third in time) perforated the skin of the left lower back, perforated the liver and right lung, and was recovered beneath the skin of the right side of the chest. The course of this bullet was from back to front, left to right, and upwards. There was no evidence of close range firing on any of the wounds. The autopsy also revealed that the victim had morphine in his blood, in an amount consistent with having injected or ingested heroin some hours before his death. The victim was 6 feet tall and weighed 280 pounds.

Four witnesses were presented by the defendant at trial who testified to prior violent encounters with the victim. Thomas Gamino testified that the victim fired four shots at him, hitting him three times in the leg, after accusing Gamino of being disrespectful. The victim pled guilty to a charge of aggravated battery. Sergeant Thomas Fuller of the Chicago police department testified that he was approached by the victim while on patrol in his police car. The victim attempted to strike the sergeant through the car window, and struggled when Fuller arrested him. The victim pled guilty to a charge of battery. Alfredo Garcia testified that he owned a building in the neighborhood. When he asked the victim to stop threatening his tenants, the victim showed a gun and started hitting Garcia. Adolpho Leon Ramirez testified that the victim and several of his friends staged a fake fight in a restaurant which he (Ramirez) owned, resulting in $200 to $300 damage, after Ramirez refused to give them free food in return for protection. The victim pled guilty to a charge of criminal damage to property.

The defendant testified at his trial. He stated that approximately a week before the incident, the victim approached him and asked him for money. Defendant told him that he had none. Defendant noticed a pistol "right on him in his waistline." The victim pushed the defendant against a brick fence and took his gold St. Ignacius medal and his wallet and money. Immediately thereafter, defendant stopped a passing paddy wagon and told the police what had happened. The victim told the police that he was just playing around, that defendant overreacted, and then returned the wallet and money. Neither the pistol nor the medallion was found.

Following that event, defendant bought a gun, even though he had been previously given a conditional discharge for a robbery conviction and knew that carrying a weapon was a violation of the terms of his discharge. Defendant said that he feared for his safety and being robbed again.

Continuing his testimony, defendant stated that on June 22, 1987, he was walking down 21st Street towards the Godinez house, on the way to visit a friend, when the victim grabbed him and threw him into the gangway against a fence. The victim asked him for money, and when defendant said he did not have any, the victim tried to reach into defendant's pockets. Defendant pulled away, and the victim pulled out a chrome pistol. Defendant already had his pistol out and headed for the stairs to the gangway. When he reached the first step, he fired his weapon at the victim. Thinking he had missed the victim, he turned around and fired two more times. Defendant said he shot because he thought the victim was going to kill him.

After firing the shots, the defendant ran towards the next gangway and through an alley. He threw his gun away as he was running and went home.

Defendant admitted that he did not initially tell the police that he had shot in self-defense. He explained that he was afraid of going to jail for violating the terms of his conditional discharge by having a gun.

Defendant also acknowledged that his nickname was "Dillinger." He admitted that he had fired from a distance, with the victim being inside the gangway and defendant on the first step leading into the gangway when he fired the first shot and at the top of the steps, about five feet away from the victim, when he fired the second and third shots.

The jury found defendant guilty of voluntary manslaughter, and the court sentenced him to 15 years' imprisonment. Defendant now appeals.

Opinion

Defendant first contends that the evidence is insufficient to prove him guilty of voluntary manslaughter beyond a reasonable doubt. He claims he offered sufficient evidence at trial to raise the issue of self-defense and that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. We disagree.

In order to legally justify a killing on the basis of self-defense, a defendant must have been acting under a reasonable belief that the use of force which was intended or likely to cause death or great bodily harm was necessary to prevent imminent death or great bodily harm to himself. (*People v. White* (1980), 87 Ill. App. 3d 321, 322-23, 409 N.E.2d 73; Ill. Rev. Stat. 1987, ch. 38, par. 7—1.) The following elements must each be present: (1) force has been threatened against the person; (2) the threatened person is not the aggressor; (3) the danger of harm is imminent; (4) the force threatened is unlawful; and (5) the defendant must reasonably believe that danger exists, and that countering it requires force, and the force required is the kind and amount of force used by the defendant. *People v. Kyles* (1980), 91 Ill. App. 3d 1019, 1021, 415 N.E.2d 499.

When a defendant raises the issue of self-defense and introduces some evidence of each of these elements, the burden shifts to the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. (*People v. Harris* (1987), 154 Ill. App. 3d 308, 315, 506 N.E.2d 1353.) If the State negates any one of the elements beyond a reasonable doubt, it has met its burden and the defense must be rejected. *Harris*, 154 Ill. App. 3d 308, 506 N.E.2d 1353.

Defendant maintains that his unrebutted testimony establishes each of these elements. Romero grabbed the defendant, threw him against a fence and threatened him with a pistol. Romero was a large man, 6 feet tall weighing 280 pounds, with a reputation as a violent man. Romero was known to carry a gun and had robbed the defendant just a week before the killing.

The trier of fact, however, need not accept as true the defendant's testimony regarding the incident and the necessity for self-defense. (*People v. Jordan* (1985), 130 Ill. App. 3d 810, 812-13, 474 N.E.2d 1283.) It is for the trier of fact to weigh the evidence and consider the probability or improbability of the defendant's testimony, the testimony of other witnesses and the circumstances of the killing. *Jordan*, 130 Ill. App. 3d 810, 474 N.E.2d 1283.

■ Contrary to defendant's assertion, there is evidence in the record sufficient to rebut his testimony and provide a justifiable basis

for the jury's finding that his belief at the time he fired the shots was unreasonable. The victim was shot three times. Two of the shots were to the victim's back and took an upward path. From this, the jury could infer that those shots were fired when the victim was facing away from the defendant and was either already down or in the process of falling down. Moreover, the last two shots were fired after the defendant had escaped the victim's grasp and had moved to a distance of some five feet from the victim. Thus, even if the victim had originally threatened defendant as defendant claims, at this point, with his back to the defendant and while already on the ground or in the process of falling down, the victim no longer posed a threat to the defendant. "[T]he use of deadly force generally cannot be justified once the aggressor has been disabled or disarmed." *(People v. Chatman* (1981), 102 Ill. App. 3d 692, 700, 430 N.E.2d 257.) "[I]f one responds with such excessive force that one is no longer acting in self-defense but in retaliation, such excessive use of force renders one the protagonist; a nonaggressor has a duty not to become the aggressor." *People v. Nunn* (1989), 184 Ill. App. 3d 253, 269, 541 N.E.2d 182.

In addition, although defendant testified that "Beto" pulled a gun, no gun was found. The failure to find a gun at the scene does not necessarily establish that defendant's fear of imminent harm was unreasonable, since it is not necessary for the victim to have actually possessed a weapon in order to justify a killing in self-defense. *(People v. White* (1980), 87 Ill. App. 3d 321, 409 N.E.2d 73.) Here, however, defendant testified to the fact that the victim actually threatened him with a drawn pistol. Therefore, the fact that no gun was found is relevant towards materially impeaching defendant's version of the facts which he presented to justify a claim of self-defense.

Defendant also testified that when the victim pulled his gun, the defendant already had his gun out. "[O]ne cannot '[i]nitially provoke[ ] the use of force against himself, with the intent to use such force as an excuse to inflict bodily harm upon the assailant.' (Ill. Rev. Stat. 1983, ch. 38, par. 7—4(b).)" *People v. Nunn*, 184 Ill. App. 3d at 269.

The reasonableness of a defendant's belief that the danger he faced required force in response is a question of fact to be resolved by the trier of fact. *(People v. Jordan*, 130 Ill. App. 3d at 812.) On review, we will not disturb the determination of the trier of fact on a self-defense issue "unless the evidence is so unsatisfactory as to justify a reasonable doubt as to guilt." *(People v. Jordan*, 130 Ill. App. 3d at 813.) For the reasons discussed above, we cannot say that the evidence is so unsatisfactory to raise a reasonable doubt as to

whether defendant acted in self-defense, and, therefore, we shall not disturb the jury's determination of that issue.

We also disagree with defendant's second contention, that he was prejudiced by the prosecution's use of the name "Dillinger" to identify him as the assailant in this case.

Generally, there is no impropriety in referring to a defendant by his or her nickname. *People v. Travis* (1965), 64 Ill. App. 2d 197, 201, 212 N.E.2d 272 ("We do not think that reversible error was committed in calling the defendant by the name by which he was known at the time of the commission of the alleged crime [('Wyatt Earp')]'"). See also *People v. Thomas* (1972), 8 Ill. App. 3d 690, 694, 290 N.E.2d 309 ("It is not reversible error to call defendant by his nickname [('Tex')]'"); *People v. Adams* (1987), 156 Ill. App. 3d 444, 509 N.E.2d 482, *vacated on other grounds* (1988), 119 Ill. 2d 560, 521 N.E.2d 941 (same ("Ice Mike")).

■ Notwithstanding this general principle, ordinary considerations of fair play would dictate that the use of a nickname which has a pejorative connotation should be permitted sparingly, only if there is a showing of necessity for its use. While "Dillinger" does have such a pejorative connotation to the extent that it may invoke association with crime and violence, the record is clear that there was sufficient justification to permit its use.

Here, prior to trial, the court heard argument on defendant's motion *in limine* to prevent reference to his nickname and ruled that the nickname could be used because the witnesses knew the defendant by his nickname. There is no question that defendant bore that nickname, since he admitted to that fact. The record shows that at the time the shooting occurred, two witnesses, Gregory Carrizales and Rudy Romero, knew the defendant only by that nickname. (See *Travis*, 64 Ill. App. 2d at 201 (defendant was known to some witnesses only as "Wyatt Earp").) Another witness, Nancy Godinez, also knew the defendant by his nickname.

Defendant contends that even if there was some limited justification for the use of his nickname, the prosecution's use was excessive. In view of the fact that some use of the nickname was clearly justifiable and in view of the further fact that defense counsel himself referred to the defendant three times as "Dillinger" in closing argument, we cannot say that any excessive use in this case rose to the level of prejudicial error to mandate reversal.

The cases upon which defendant relies in his contention that the use of his nickname was reversible error are not in point. In none of those cases was the use of a defendant's nickname even at issue. (See

*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238 (evidence of a separate crime, committed after the offense for which defendant was on trial, held to be irrelevant and prejudicial); *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734 (prejudicial error for State to introduce testimony about weapons, unrelated to the crime at issue, which were found at the defendant's home for purpose of showing defendant's evil character); *People v. Harges* (1967), 87 Ill. App. 2d 376, 231 N.E.2d 650 (prejudicial error to suggest or intimate that the defendant was a criminal or that he had been charged with criminal offenses).) Here the only evidence of other crimes committed by the defendant came when defendant, on direct examination by his own attorney, admitted that he had previously pled guilty to a robbery.

Defendant's third contention on appeal is that portions of the prosecutor's cross-examination of defendant and closing argument were tantamount to charging his attorney with the creation of a "phony defense," thereby denying him his right to a fair trial. (*People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298; *People v. Clark* (1983), 114 Ill. App. 3d 252, 448 N.E.2d 926.) He bases this argument on the following cross-examination of the defendant:

"Q. [Assistant State's Attorney:] Now, when you realized that you had lied to all those law enforcement officials and the State's Attorney back at Area Four Headquarters, you knew there was the GRS [*sic*] kit that had been taken from you, isn't that correct?

A. I'm not aware what the—can you—

Q. Well, you heard Melko [police evidence technician] testify that he took those hand swabs from you at Area Four and that was to determine whether you fired a gun, isn't that correct?

A. Yes, it is.

Q. And you heard Dr. Kaistha say that he was requested to work up that kit in May and June of '87 or '88, isn't that correct?

A. That is correct.

Q. A year later?

A. That is correct.

Q. And it was your attorney who paid and requested for that test, isn't that correct?

MR. FEDERMAN [defense attorney]: Objection. Ask it be stricken.

THE COURT: I'll sustain the objection.

MR. FEDERMAN: Objection. Ask for a side bar.

(A discussion was had off the record.)

THE COURT: Back on the record.

Q. [Assistant State's Attorney:] Well, back in May of 1988, while this case was pending and the murder charges had been lodged against you, was it your desire to have this gunshot residue kit worked up for analysis to show that you had fired a handgun, was it your desire to have that done?

A. No.

Q. Did you ever tell anybody, 'Hey, don't worry about it. I fired the gun, it's self defense. Don't bother with that kit being worked up,' did you ever tell anybody?

* * *

THE WITNESS: Can you repeat the question please, sir?

Q. Well, after you lied at Area Four, did you ever tell anybody else from that date to May of 1988, 'Don't bother working up the gunshot residue kit because this is a self-defense case and I fired the gun.'?

MR. FEDERMAN: I'm going to ask for a side bar.

THE COURT: He may answer that question.

A. I had [a] conference with my attorney and I did tell him I had fired a gun at the time.

Q. You did tell him that. And then you had the gunshot kit—

MR. FEDERMAN: Objection. He testified. He testified he didn't ask for it.

THE COURT: Sustained.

Q. [Assistant State's Attorney:] Isn't it true, sir, that until that gunshot residue kit came back positive, this wasn't a self-defense case?

A. Yes, it was, sir.

MR. FEDERMAN: Objection, Judge. Objection.

THE COURT: Sustained."

Later, in closing argument, the prosecutor said:

"What did he tell the police on June 23rd? I don't know anything about that shooting, Officer. I wasn't there. I was home with my grandmother.

Think about it, ladies and gentlemen. On June 23rd, 1987, this man is telling the police an alibi. On October 20th, 1988, he takes that stand and he tells you self-defense. Think about it, ladies and gentlemen. Was there anything that happened in between that time that was significant?

Well there was, wasn't there. On June 2nd, 1988, Dr. Kaishtha filed his report on the gunshot residue test on this man's hand and that report showed that he had handled or discharged a firearm. Well, gee, alibi isn't going to work anymore. I guess I have to come up with something different. So now I'll say it was self-defense.

It's a phony defense, ladies and gentlemen. Phony defense made up by him when he saw his alibi defense wasn't going to work anymore."

The defendant contends that the prosecutor, by his questions to the defendant and the excerpted portion of his closing argument, intended to make it appear that defendant's attorney deliberately and fraudulently created defendant's self-defense strategy. Moreover, the defendant urges that the State's reference to defendant's failure to "tell anybody" about self-defense in May of 1988 was an impermissible comment on the defendant's post-indictment silence.

The State maintains that defendant has waived objection to these questions and comments by failing to include them in his post-trial motion. In addition, no objection was made during trial to the State's comments during closing argument. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124 (to properly preserve an issue for appeal, defendant must object at trial and raise issue in post-trial motion).) We agree with the State and find that defendant has waived these issues.

■ However, notwithstanding any waiver, we find no error here. While it is reversible error for the prosecutor to disparage defense counsel and to suggest that the defense presented was fabricated by counsel (*People v. Starks*, 116 Ill. App. 3d at 394), our reading of the objected-to questions on cross-examination and closing argument reveals no reversible error.

In cross-examining the defendant, there was one direct reference by the prosecutor to the defendant's attorney and one indirect reference to the attorney which only came about as a result of defendant's answer. In the direct reference, defendant was asked, "[I]t was your attorney who paid and requested for that test [GSR], isn't that correct?" An objection to this question was promptly sustained. This should have sufficiently mitigated the impact of the question, particularly since that question by itself even if allowed to stand falls short of directly charging the attorney with any impropriety. (*Cf. People v. Clark*, 114 Ill. App. 3d at 254 (objections overruled to prosecutor's closing arguments referring to "attorney's tricks" and "sleight of hand").) Subsequently, in the indirect reference, the defendant was

asked whether he told anyone he had fired the gun, to which he responded that he told his attorney. In this instance, it was the defendant, not the prosecutor, who mentioned the defense counsel. Moreover, that a defendant who claims that he shot in self-defense would make such a statement to his attorney seems natural and does not necessarily imply that the attorney assisted in fabricating the defense presented at trial.

The State's theory was that defendant's testimony pertaining to self-defense was concocted by the defendant only after the gunshot residue tests revealed that defendant had fired a gun. These questions are consistent with the State's effort to impeach defendant by emphasizing the inconsistency between the defendant's alibi statements immediately following the shooting and his testimony pertaining to self-defense presented at trial.

Likewise, with respect to the State's closing argument, we find no error. We do not disagree with defendant's premise that closing arguments by a prosecutor which charge defense counsel with creating a phony defense can constitute prejudicial error. "Unless based on some evidence, statements made in closing arguments by prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper." *People v. Emerson* (1983), 97 Ill. 2d 487, 497, 455 N.E.2d 41. See also *People v. Polenik* (1950), 407 Ill. 337, 348, 95 N.E.2d 414 ("Such argument cannot possibly aid the jury in weighing or evaluating the evidence, but tends only to arouse its antagonism against defendant and his attorney"); *People v. Suggs* (1977), 50 Ill. App. 3d 778, 783, 365 N.E.2d 1118 (verbal attacks and accusations against defense attorney "tended to arouse the antagonism of the jury and to create a trial of the lawyers rather than a determination of the issue of guilt").

Defendant contends that by using the phrase "phony defense," the prosecution was implying that the claim of self-defense as put forth at trial was fraudulent, and was conceived and developed at the direction of or with the assistance of his counsel, and thereby impugned the integrity of his counsel.

We disagree. While the term "phony defense" may connote a strategy fabricated for trial, it does not necessarily imply that the attorney had any part in its creation, or was even aware that it was false. The excerpts quoted above do not sufficiently refer to defendant's attorney or ascribe to him any wrongdoing for us to conclude that they were disparaging of the attorney and thereby rise to reversible error. In its closing argument, the prosecution made no direct ref-

erence to defense counsel. The prosecution's remarks were directed to the credibility of the defendant and the merits of his story. The prosecution referred to what he (defendant) told the police on June 23, 1987, and the "phony defense" made up by him (defendant). It is not improper to charge a defendant with lying if conflicts in the evidence make such an assertion a fair inference. *People v. Starks*, 116 Ill. App. 3d at 394. See also *People v. Hooper* (1989), 133 Ill. 2d 469, 489, 552 N.E.2d 684 (characterization of defendant's story as "ridiculous, absurd, obscene defense" was not comment on integrity of attorney, but rather comment on defense's story).

The fact that the closing argument made no direct reference to defense counsel sets apart the instant case from *People v. Starks*, cited by defendant. There the prosecutor made direct, clear and pointed reference to defense counsel, calling his closing argument "the most ridiculous double talk that I have ever heard in my life," and said the jury should not be "hoodwinked" or "fooled" by "that defense, that pack of lies you heard." *Starks*, 116 Ill. App. 3d at 394. See also *Polenik*, 407 Ill. at 348 ("Defense lawyers, who practice criminal law day in and day out, they are the ones that concoct these defenses").

■ We also reject defendant's contention that it was error for the State to make reference to defendant's failure to "tell anybody" about self-defense immediately following the shooting. His reliance on *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229, is misplaced. There the issue was the constitutionality of comment by the court on defendant's failure to testify at trial. Here, the State's remarks were not comments on defendant's failure to testify, but were comments on the inconsistency between statements the defendant made to the police and his testimony at trial. (See *People v. Williams* (1987), 164 Ill. App. 3d 99, 517 N.E.2d 745.) It is not error for the prosecution, in connection with proper impeachment of a defendant's testimony by his prior inconsistent statements, to refer to a defendant's failure to tell the police the exculpatory story he presents at trial. *People v. Rehbein* (1978), 74 Ill. 2d 435, 386 N.E.2d 39.

Finally, defendant contends that the trial court abused its discretion in sentencing him to 15 years' imprisonment, the maximum allowable penalty for voluntary manslaughter. He argues that the court failed to take into account mitigating factors such as defendant's rehabilitative potential as evidenced by three letters presented to the court, his close ties to his family and his young age (19). In addition, the defendant contends that the court failed to consider the factors in

mitigation as set forth in section 5—5—3.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.1):

"(a) The following grounds shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment:

\* \* \*

(3) the defendant acted under a strong provocation;

(4) there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense."

■ The record reveals, however, that the trial court did purport to consider all of these factors when imposing sentence. The court stated:

"I note that there is—there are positive aspects of Mr. Murillo which are reflected in those, in that correspondence as well as reflected in his mother's statement.

I do take note of the fact that during the trial because of the defense of self-defense there was wide latitude given to the defendant to bring out the character of the deceased and there was much evidence concerning acts of violence on his part.

\*\*\* To a great degree that evidence no doubt contributed to the jury's verdict of guilty of voluntary manslaughter rather than the charged offense of murder. The jury from its verdict obviously concluded that the defendant's belief and need to defend himself was an unreasonable one. I would say that that is a minimally demonstrable fact from the evidence.

I conclude that a lengthy period of incarceration in the Illinois Department of Corrections is appropriate and it is my conclusion that given the facts in this case and given the fact that the defendant indeed had been convicted of robbery just a couple of weeks before this and was at that very time on conditional discharge through his own admission, had a gun and that gun was used in this offense, it seems appropriate to me that the defendant be sentenced to the Illinois Department of Corrections for the maximum period for voluntary manslaughter.

Mr. Murillo, I will sentence you to a period of 15 years for this offense."

The imposition of a sentence is a matter of judicial discretion and, absent an abuse of that discretion, will not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) A reasoned judgment as to the appropriate sentence in a given case must be based upon the particular circumstances and factors of that case, including "the gravity of the offense and the circumstances of [the]

commission, the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, age, and criminal history." (*People v. Bradford* (1989), 187 Ill. App. 3d 903, 922, 543 N.E.2d 918.) It is the function of the sentencing court and not this court to strike the appropriate balance between the protection of society and rehabilitation of the offender. (*Bradford*, 187 Ill. App. 3d 903, 543 N.E.2d 918.) Even if we might balance the factors differently than did the trial court, we must decline to do so. *People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882.

The record shows that the court did not ignore the existence of the factors which defendant contends justify a lesser sentence. The court specifically made reference to defendant's positive aspects. As to the statutory mitigation factors, the court's remarks indicate that it found them to be absent, and that defendant was not acting under a strong provocation nor was there substantial ground tending to justify his conduct. Against these, it balanced the nature and circumstances of the offense and the defendant's prior criminal record. We cannot say that the court abused its discretion by imposing the maximum sentence.

Accordingly, for all the above reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY, P.J., and LORENZ, J., concur.