2022 IL App (1st) 201071-U

No. 1-20-1071

Order filed December 21, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 02791 |
| | ) | |
| LOWELL HOUSER, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Burke and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for second degree murder is affirmed over his contention that the State did not prove beyond a reasonable doubt that his actions were not justified as self-defense. The trial court did not abuse its discretion in precluding defendant from presenting evidence of the victim's aggressive and violent character that was remote in time from the instant offense.

¶ 2    Following a bench trial, defendant Lowell Houser was convicted of second degree murder (720 ILCS 5/9-2(a)(2) (West 2016)) and sentenced to 10 years in prison. On appeal, defendant, an off-duty police officer who claimed self-defense, challenges the sufficiency of the evidence,

contending that the State failed to disprove justification where the victim angrily confronted him, threatened to shoot him, and reached towards his rear waistband in the moments before the shooting. Defendant also contends that the trial court erred in imposing a 10-year cutoff for evidence of prior instances of the victim's aggressive and violent character, rather than giving each incident individualized consideration in determining its admissibility. For the reasons that follow, we affirm.

¶ 3       Defendant's conviction arose from the January 2, 2017, shooting death of Jose Nieves in front of Nieves's apartment building in Chicago. Following arrest, defendant was charged by indictment with six counts of first degree murder.

¶ 4       Prior to trial, defendant filed a motion pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), seeking the admission of evidence of 10 prior incidents he alleged showed Nieves's aggressive and violent conduct. Defendant indicated that the defense was attempting to secure the cooperation and presence at trial of witnesses who could testify regarding the incidents and stated that the defense's answer to discovery would be supplemented when those witnesses were located. Defendant explained that he was presenting the motion "so that everyone is aware of the nature of the evidence that [defendant] will attempt to present at trial."

¶ 5       As an offer of proof, defendant provided information about the incidents that he had gleaned from police reports. The 10 incidents were as follows: (1) on December 25, 1996, Nieves threatened a woman that he would "blow her away" and he was arrested for assault; (2) on March 29, 1998, Nieves struck a man in the face, causing a laceration to his eye, and was charged with battery; (3) on May 10, 1999, Nieves yelled profanities and flashed gang signs at men in a rival gang and was charged with disorderly conduct; (4) on September 21, 1999, Nieves screamed gang

slogans, flashed gang signs, told officers "f*** the police," and was arrested for mob action; (5) on March 17, 2000, Nieves threw several punches at a man, threw a brick at the man's door, and was charged with assault and criminal damage to vehicle; (6) on December 7, 2001, Nieves went to a former employer's business, threatened to kill the owner and blow up the manager's home, and was arrested for two counts of assault; (7) on December 15, 2006, Nieves was arrested because he had an outstanding warrant for violating an order of protection; (8) on January 13, 2008, Nieves struck his wife in the face, attempted to strangle her, swung a knife at her, and was arrested for domestic battery; (9) on June 22, 2012, Nieves argued with two women on a sidewalk while he had a pellet or BB gun in his front waistband and was charged with a city ordinance violation; and (10) on January 28, 2013, Nieves slapped his ex-girlfriend in the head and ear, causing a red mark; she signed a complaint against him for domestic battery; and lock-up staff noted Nieves was "very hostile and abusive" during booking.

¶ 6    The State filed a response, arguing that the *Lynch* material should be barred. The State asserted that there was no evidence of self-defense, that defendant did not know Nieves's criminal history at the time of the shooting, that Nieves was not armed, and that Nieves was not the initial aggressor. The State further argued that the prior incidents of Nieves's behavior were remote in time, with only three falling within a 10-year period preceding the current charge, and that at least three of the incidents did not involve "crimes of violence." Finally, noting that none of the incidents resulted in convictions, the State asserted that mere arrests did not meet the level of reliability mandated by *Lynch*.

¶ 7    The trial court held a hearing on the *Lynch* motion on April 4, 2019. At the hearing, defense counsel reiterated that the motion was based on a preliminary investigation and arrest reports, and

that the defense understood witness testimony regarding the incidents would be required at trial. As to the fact that the majority of the incidents occurred more than 10 years prior to the instant offense, defense counsel maintained that their age "cut[ ] the other way," as they "show[ed] the longstanding, almost ingrained pattern of violent, threatening behavior by Mr. Nieves." Counsel also argued that "the fact that some of the cases go back a number of years actually is proof of how compelling this evidence is."

¶ 8    The State argued that the prior incidents were remote in time, uncertain, and unduly prejudicial. The State also reiterated its positions that, because none of the incidents resulted in a conviction, they did not meet the level of reliability mandated by *Lynch*, and that the incidents not involving crimes of violence were not allowed under *Lynch*.

¶ 9    Citing *People v. Ellis*, 187 Ill. App. 3d 295 (1989), the trial court ruled that the incidents that occurred more than 10 years prior to the shooting were inadmissible. It reserved ruling on the admissibility of the three more recent incidents, stating, "[W]e'll just have to see how this plays out. We can revisit it at the time of trial."

¶ 10    Defendant's bench trial commenced on October 29, 2019.

¶ 11    Michelle Malkowski testified that she had been in a dating relationship with Nieves for 12 years. On the morning in question, she was helping him move some of his belongings from a storage unit to his second-floor apartment. He was wearing a camouflage jacket, a t-shirt, jeans, and a belt. His shirt was tucked in and his jacket was open. Nieves was not carrying a gun or any other weapon.

¶ 12    Around 9 a.m., Malkowski and Nieves arrived at his building in separate cars and parked on the street. After they took some boxes inside, Malkowski headed back outside to her car. She

encountered defendant, who was also leaving the building. Malkowski did not know defendant's name but had seen him around the building on other occasions, entering a first-floor apartment and walking a dog in the early morning hours. At the gate near the sidewalk, she used a newspaper to prop open the gate. Defendant, who was behind her, told her "we don't do those things around here." Malkowski explained to him that she was propping the gate open so it would be easier to carry items inside and said she would close the gate after she was done.

¶ 13    Defendant proceeded to his car, which was parked across the street, entered it, and started to pull away from the curb. Malkowski was taking boxes out of her trunk when defendant rolled his window down and asked her who she was to Nieves, if she was his mother, and why she was helping him. He told Malkowski that Nieves was "no good to women" and "a piece of s***," and that she should not be helping him. Malkowski did not respond.

¶ 14    About this time, Nieves exited the building and walked up behind Malkowski. He asked her what defendant was saying and Malkowski told him. Nieves, who was angry, walked around Malkowski and asked defendant, "[I]f you have something to say, why aren't you saying it to me, why are you saying it to her?" Defendant was still in his car and the two men were about three feet apart. Nieves was still wearing his jacket. Malkowski turned around and went back inside the building because she did not want to get involved.

¶ 15    About a minute later, just after Malkowski had dropped off a box in Nieves's apartment and was at the top of the stairs, she heard a "bang." She described it as a "really loud and distinctive shot." She ran down the stairs and outside, where she saw Nieves lying face-up in the street between her car and another parked car, with his head toward the curb and his feet toward the street. Nieves's jacket was on the roof of Malkowski's car. Malkowski described Nieves as "neatly

tucked in between the two cars that were on the street, he had his arms across his chest, his shirt was tucked into his pants, and he was dying." Specifically, his eyes were rolling back, his face was changing colors, his lips were turning purple, and pieces of his finger were missing. Then his eyes stopped rolling and he was still. Malkowski called 911.

¶ 16    During this time, defendant was standing in the middle of the street, on the phone, "casually in a conversation." Malkowski did not see any injuries on defendant and observed that his clothes were not rumpled or in disarray. He did not appear agitated or excited, did not express any concern about Nieves's condition, and did not attempt to render any aid for Nieves. Malkowski asked him, "Why did you shoot him? You didn't have to hurt him." Defendant did not respond. Malkowski noted that defendant's car was fully parked.

¶ 17    On cross-examination, Malkowski agreed that after she told Nieves what defendant said to her, Nieves "immediately went over and confronted" defendant in his car. She did not hear whether defendant said anything to Nieves, because she had turned and walked inside the building. She clarified that while she was on the second floor, she heard three shots: "It was boom, slight pause, a one- to three-second pause, and then boom, boom, consecutive." Malkowski acknowledged that when she was interviewed by an Independent Police Review Authority (IPRA) investigator on the day of the shooting, she described the shots as, "Plop, plop, plop. It was like consistent. It was right after each other." She also told the investigator that when defendant was on the phone, he was "[g]iving them his information that it was a police shooting."

¶ 18    Melchor Galva testified through an interpreter that he lived next door to the building where Nieves and defendant resided in different units. On the morning in question, Galva was watching television in his living room, the window of which overlooked the street. Around 9 a.m., Galva

looked out his window and saw Nieves walking on the sidewalk toward his car, which was parked on the opposite side of the street. Shortly thereafter, Galva noticed Nieves walking back toward his building and saw defendant in his car, which was parked in front of Nieves's car. The two men were talking or arguing, but Galva could not hear what they were saying. At that point, Nieves was wearing a coat.

¶ 19    Galva turned his attention to his television. Then he heard a "boom," which he thought was something blowing up in his building. He looked out the window and saw defendant "standing there pointing with his gun." Nieves had his left hand to his chest and grabbed onto a car with his right hand. Galva did not see anything in Nieves's hands. Galva heard a second "boom" and saw Nieves fall to the ground between two parked cars, with his head on the curb. Galva ran to the back of his apartment.

¶ 20    On cross-examination, Galva stated that he never saw Nieves approaching or walking toward defendant. He noticed that, prior to the first shot, Nieves had his left hand "[i]nside of his pocket" or "had his hand here inside the jacket when he was talking to [defendant]." Next, Galva explained, "What I saw was after the first shot I saw towards the front, I saw him with a gun in his hand. I saw [Nieves], I saw him, and then he shot at him, the second shot when he grabbed himself and he fell[.]" Galva agreed that when Nieves fell, he could not see Nieves's hands because the cars blocked his view. He also agreed that he never saw defendant approach Nieves. He explained that he did not know if there was a third shot because he ran after the second shot was fired. He acknowledged testifying before the grand jury that when Nieves was walking prior to the shooting, he was wearing a jacket and "it looked like he was taking it off."

¶ 21    The parties stipulated that, if called as a witness, Chicago police officer Roberto Serrano would have testified that, when he arrived at the scene, defendant approached him and tendered documents verifying his status as a Chicago police officer. Serrano observed Nieves's body lying between two cars.

¶ 22    Chicago police detective Marc Leavitt testified that he responded to a call of a shooting involving an off-duty police officer and interviewed defendant in an unmarked SUV. During the interview, defendant related that he had been visiting a female friend in the building. When he was pulling out of his parking spot on the street, "a male Hispanic was in front of his car blocking him from pulling out from his parking spot yelling at him." Defendant did not give a name for the "male Hispanic" and did not indicate any relationship to him. Defendant told Leavitt that he could not understand some of what Nieves was saying, but he remembered hearing the word "eagles." Leavitt assumed that "eagles" was gang terminology, and defendant indicated to Leavitt that that was his belief as well.

¶ 23    Defendant related that he told Nieves he was a Chicago police officer and was "not about violence." Nieves replied, "I know a Chicago police officer, I'll f***ing shoot you, I'll burn this f***ing car." Defendant told Leavitt that Nieves began reaching into his "back side near his waistband area," at which time defendant began to exit his car. Defendant told Leavitt "that he was afraid of being shot and thought that Mr. Nieves was reaching for a gun to shoot him so I shot him." Defendant said he fired one shot in Nieves's direction but was unsure if he hit him. Nieves began moving away from defendant and in between two parked cars. Nieves then "turned back towards [defendant] still with his hand in his back side near his waistband." Defendant "still

believed that Mr. Nieves had a gun and that he was going to shoot him so [defendant] stated that he shot two more times at him with Mr. Nieves then falling to the ground."

¶ 24 Defendant told Leavitt that after Nieves fell, he retrieved his phone from his car, called 911, and backed his car back into his parking spot. He then exited his car and waited for the police and an ambulance to arrive. When Leavitt asked defendant whether he had seen Nieves before, defendant said "that he got into it" with Nieves three weeks prior and the police were called. Around this point in the interview, Leavitt was notified that Nieves had died. Pursuant to a policy that IPRA was to handle all fatal police shootings, Leavitt terminated their conversation. According to Leavitt, defendant never claimed he saw Nieves with a gun.

¶ 25 On cross-examination, Leavitt agreed defendant told him that, during the prior incident, he had intervened when Nieves was fighting with defendant's friend's son. He also agreed that defendant did not claim Nieves said he was a member of a gang called the Eagles. Leavitt stated that he had heard of a gang called the Latin Eagles. During the interview, defendant said he was "shaken up." Leavitt described defendant as quiet and said, "[Y]ou could tell things were running through his mind."

¶ 26 Joseph Scumaci, an evidence technician with the Chicago police department, testified that he and other technicians photographed and video-recorded the scene. Among other things, they photographed a camouflage jacket that was on the roof of a car. After the jacket was recovered, they also photographed its front and back at their office. During his handling of the jacket, Scumaci did not observe any apparent bullet holes or blood on it. Scumaci also testified that police recovered three spent cartridge cases from the scene.

¶ 27    Dr. Stephanie Powers, the medical examiner who supervised Nieves's autopsy, testified that he suffered three gunshot wounds with no evidence of close-range firing. One of the gunshot wounds was to Nieves's back. The hollow-point bullet entered the lower left side of the back, proceeded through muscle and multiple organs, and embedded itself in the chest, where it was recovered. The projectile pathway proceeded in a foot-to-head direction. The bullet's trajectory was consistent with Nieves having had his back to the weapon and being bent over at the waist.

¶ 28    A second gunshot wound occurred when a bullet entered the palm of Nieves's right hand and exited the back of the hand. A third gunshot wound was to Nieves's right arm. Bullet fragments were recovered from the hand and arm wounds. The hand and arm wounds were consistent with positioning where Nieves's right elbow was bent, his right hand was up with the palm facing forward, and the bullet passed through the hand and entered the right arm.

¶ 29    Powers also observed blunt force injuries to Nieves's head and torso and abrasions consistent with him falling and coming into contact with a car or asphalt. Powers examined Nieves's clothing and noted holes in the back of his t-shirt and tank-top undershirt that corresponded to the gunshot wound to his back. Powers concluded that Nieves died as the result of multiple gunshot wounds and that the manner of death was homicide.

¶ 30    On cross-examination, Powers explained that without doing test firing with the gun used in the shooting, the firing distance could not be precisely determined. However, she explained that a typical handgun firing 9-millimeter ammunition would show evidence of close-range fire up to a distance of approximately two feet. As such, she surmised that the firing distance in this case was probably greater than two feet.

¶ 31   Defendant made a motion for a directed finding, arguing that the State had not proved beyond a reasonable doubt that he shot Nieves without lawful justification. The trial court denied the motion.

¶ 32   Defendant did not testify or present any evidence.

¶ 33   On December 20, 2019, the trial court entered a written order, which it summarized orally, finding defendant guilty of the lesser mitigated offense of second degree murder. The court explained that the State had proven the elements of first degree murder but, also, that the evidence supported that defendant had an actual, subjective, albeit unreasonable, belief that he was threatened with imminent, unlawful force and was required to use the force he applied to protect himself. The court noted that defendant told Detective Leavitt that Nieves threatened to shoot him, reached toward his rear waistband area, and continued to reach toward his back after defendant fired his first shot. The court found that no evidence refuted defendant's account, as neither Galva nor Malkowski observed the entire shooting, "only events before and after." The court also found, based on Malkowski's testimony, that Nieves was angry and confronted defendant on the street and, based on Malkowski's and Galva's testimony, that the confrontation was of a "hostile nature."

¶ 34   However, the court also noted that the evidence showed Nieves took off his coat and placed it on the hood of Malkowski's parked car, and found that the inference to be drawn from this action was that Nieves "was preparing for a physical fight." The court observed that Nieves was not armed and did not possess any object that could have reasonably been mistaken for a gun, and that defendant did not claim to have seen such an object. Given these circumstances, the court found that defendant was not justified in the use of deadly force.

¶ 35   The court wrote as follows:

"It was not reasonable to believe that circumstances existed to justify the use of deadly force in this case. Even through Nieves may have been aggressive, the evidence suggests he was ready for a fist fight. But [defendant] brought a gun. Nieves had taken his coat off and his attire made it unlikely he was concealing one. So even if Nieves did reach toward his back waistband area, it was not reasonable for [defendant] to believe, without more, that Nieves was reaching for a gun. Cf. *People v. Lee*, 213 Ill. 2d 218, 225-26 (2004) (rejecting defendant's claim that he reasonably believed the victim had reached for a gun when no gun was found, no witnesses saw a gun, and the victim's attire made concealing one difficult). Therefore, the Court rejects the self-defense claim."

¶ 36    The court further found that defendant had an actual, subjective belief that he was threatened with deadly force, albeit unreasonable. The court rejected the State's suggestion that it find defendant's statement to Leavitt incredible. In doing so, it characterized the incident as "a fast and fluid occurrence" and observed that Galva's testimony indicated that, for at least what he saw, defendant did not fire at Nieves at a time when Nieves obviously posed no threat. The court concluded that various considerations may have worked toward negating the reasonableness of defendant's use of force, but did not negate that he had an actual, subjective belief in the justified use of force.

¶ 37    Defendant filed a motion for a new trial or, in the alternative, to reconsider. Among other things, defendant argued in the motion that the trial court erred in barring potential *Lynch* material based on it being more than 10 years old, and that the error compromised his sixth amendment right to present a defense. Defendant also argued that the State had failed to disprove self-defense. Following a hearing, the trial court denied the motion. With regard to the *Lynch* material, the court

noted that the defense had not asked it to reconsider its ruling and that, although it had ruled that the more recent prior incidents were admissible, the defense "chose not to pursue those." Regarding defendant's claim of self-defense, the trial court indicated it would not change its credibility findings.

¶ 38     On February 10, 2020, the trial court sentenced defendant to 10 years in prison on count I and merged counts II, III, IV, V, and VI. Defendant filed a timely motion to reconsider sentence on March 10, 2020. The trial court denied the motion on September 10, 2020. Defendant filed a timely notice of appeal on September 15, 2020.

¶ 39     On appeal, defendant argues that the State did not prove beyond a reasonable doubt that he did not act in self-defense. When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 40     In the instant case, defendant was charged with first degree murder. First degree murder occurs when an offender kills another individual without lawful justification and either (1) intends to kill or do great bodily harm to that individual or another or knows that such acts will cause death, (2) knows that such acts create a strong probability of death or great bodily harm to that

individual or another, or (3) is attempting or committing a forcible felony other than second degree murder. 720 ILCS 5/9-1(a) (West 2016).

¶ 41    Defendant did not dispute that he shot Nieves. Rather, he raised the affirmative defense of self-defense, and the trial court ultimately convicted him of second degree murder. Second degree murder occurs when an individual commits first degree murder but a mitigating factor is present. See *People v. Thompson*, 354 Ill. App. 3d 579, 585, 587 (2004); see also 720 ILCS 5/9-2 (West 2016). The mitigating factor relevant in the instant case is if "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the [self-defense] principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2016).

¶ 42    The affirmative defense of self-defense is a recognized lawful justification to first degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). In order to raise self-defense, defendant had to provide some evidence that (1) unlawful force, which is intended or likely to cause death or great bodily harm, was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) his use of force was necessary; (5) he actually and subjectively believed a danger existed that required the use of the force applied; and (6) his beliefs were objectively reasonable. 720 ILCS 5/7-1 (West 2016); *Lee*, 213 Ill. 2d at 225. Once a defendant meets this burden, the State has to prove beyond a reasonable doubt that defendant did not act in self-defense. *Lee*, 213 Ill. 2d at 224. The State carries this burden if it negates any one of the elements of self-defense beyond a reasonable doubt. *Id.* at 225.

¶ 43    Here, the trial court found that the State negated the sixth element of self-defense beyond a reasonable doubt, concluding that defendant believed he needed to shoot to defend himself but that his belief in the need to shoot in self-defense was unreasonable.

¶ 44    Defendant contends that the State failed to prove beyond a reasonable doubt that his actions were not justified by self-defense where Nieves angrily confronted him, threatened to shoot him, and reached toward his rear waistband in the moments before the shooting. He argues that where the trial court determined that Nieves was the aggressor and that defendant acted under an actual, subjective belief that Nieves was going to shoot him, the remaining question was whether that belief was reasonable. Noting that the trial court relied on Nieves's having removed his coat to find that he was preparing for only a fistfight, defendant asserts that, while such a conclusion may appear obvious after learning no gun was found on Nieves, "the question is what would be reasonable to infer from this fact in a rapidly developing confrontation."

¶ 45    Defendant challenges the trial court's analysis, arguing that it unrealistically required him to decide in a high-stress matter of seconds that Nieves's threats were mere bluster because he had removed his jacket. He maintains that he "did not have the luxury of time or calm when faced with an angry neighbor who had just threatened him" and "it would have meant risking a lot to infer that removing a jacket meant a fist fight where [he] could not see whether Mr. Nieves was armed." Defendant maintains that where Nieves was facing him "in the final moments" and the physical evidence did not support that he could see Nieves's rear waistband to check for a gun, he reasonably feared Nieves was about to shoot him. Defendant further asserts that, in finding his fear was unreasonable, the trial court misapplied *Lee*, 213 Ill. 2d at 225, as in that case it was not just

the victim's lack of a coat that made concealment of a gun difficult, but also that the victim was wearing bib overalls.

¶ 46    The issue presented in this appeal is whether the State proved beyond a reasonable doubt that the actions taken by defendant were not justified because his belief in the need to act in self-defense was unreasonable. "The reasonableness of an individual's belief that the use of deadly force was necessary depends on the surrounding facts and circumstances and is a question of fact." *People v. Hawkins*, 296 Ill. App. 3d 830, 836 (1998). The use and amount of force exercised must be necessary to avert the danger. *Id.* at 836-37. The trier of fact is not required to accept as true the defendant's testimony regarding the incident and the need for self-defense. *People v. Murillo*, 225 Ill. App. 3d 286, 292 (1992). Instead, the trier of fact must consider the probability or improbability of the testimony, the surrounding circumstances, and the testimony of other witnesses. *In re Jessica M.*, 399 Ill. App. 3d 730, 737 (2010). A trial court's determination regarding whether the defendant unreasonably believed that his use of force was necessary will not be disturbed on appeal if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have reached that determination. *People v. Reid*, 179 Ill. 2d 297, 308 (1997).

¶ 47    After carefully considering all the evidence in the light most favorable to the prosecution, we find that a rational finder of fact could have concluded that defendant's belief that his use of deadly force in self-defense against Nieves was necessary was unreasonable. It is undisputed that Nieves confronted defendant. The two men argued and Nieves took off his coat, placing it on top of Malkowski's car. Defendant exited his own car and shot at Nieves three times, hitting him twice. According to defendant's statement to Detective Leavitt, he fired the first shot when Nieves was

reaching toward the back of his waistband, and the second and third shots after Nieves had begun moving away from him but then "turned back" towards him with a hand still at his back waistband.

¶ 48    However, the evidence, viewed in the light most favorable to the prosecution, showed that defendant fired at least one shot at Nieves while his back was turned, another while his hands were nowhere near his rear waistband, and, possibly, the third while he was on the ground. The autopsy revealed that one of defendant's three shots hit Nieves in the back, and that the upward trajectory of that bullet was consistent with Nieves having been bent over at the waist when he was hit. Separate from the autopsy, Galva testified that, after he heard the first shot, he saw Nieves put his left hand to his chest and grab onto a parked car with his right hand. He did not see anything in Nieves's hands while they were in these positions. Galva then witnessed defendant fire a second shot, after which Nieves fell to the ground and Galva ran to the back of his apartment. Under Galva's sequence of events, the third shot, which Galva did not hear, would have been fired after Nieves was on the ground.

¶ 49    Given this evidence, taken in the light most favorable to the State, the trial court could have rationally concluded that the amount of force defendant exercised was more than was necessary to avert any danger Nieves presented. See *Hawkins*, 296 Ill. App. 3d at 836-37. We cannot see how Nieves could have presented a danger necessitating a continued deadly-force response when he had empty hands pressed to his chest and a parked car, when he had his back to defendant, or when he was lying on the pavement. Based on this, the trial court could have reasonably concluded that shooting at Nieves three times—including once at his back—was not reasonable in this case. See, *e.g.*, *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 70 (where the defendant shot the victim multiple times, he could not have continued to fear death or great bodily harm after the victim was disabled);

*People v. Mikell*, 217 Ill. App. 3d 814, 828 (1991) (evidence that the victim was stabbed in the back contradicted the defendant's self-defense argument).

¶ 50    Accordingly, the trial court could have rationally found that the State proved that defendant's belief in the necessity of using deadly force in self-defense was unreasonable. The evidence supporting defendant's conviction for second degree murder was not "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to defendant's guilt. *Slim*, 127 Ill. 2d at 307. Defendant's challenge to the sufficiency of the evidence fails.

¶ 51    Defendant's second contention on appeal is that the trial court erred in imposing a rigid 10-year cutoff for *Lynch* material, rather than giving each incident individualized consideration in determining admissibility. He argues that the prior incidents deemed inadmissible by the trial court would have provided circumstantial evidence that events unfolded as he described. Specifically, he notes that two of those incidents involved Nieves threatening to kill, blow away, or blow up people; others showed that he acted out in violence; and one involved him yelling gang slogans and "f*** the police." He asserts that these incidents "line up well" with what he described to Leavitt: an angry man making gang references and then threatening to shoot him and burn his car when defendant identified himself as a police officer. While acknowledging that remoteness in time is a valid consideration in determining the admissibility of Lynch material, defendant maintains that, here, the court erred when it "mechanically" applied a 10-year cutoff without considering other factors which counseled for admission.

¶ 52    When a defendant raises self-defense as an affirmative defense, he may offer evidence of the victim's aggressive or violent character under one of two circumstances. *Lynch*, 104 Ill. 2d at 199-200. First, if the defendant knew of the victim's violent character or prior criminal acts, the

evidence may be offered to support the contention that the defendant reasonably believed the use of force in self-defense was justified. *Id.* at 200. Second, a defendant may present evidence of the victim's violent character where witness accounts about how the events in question transpired are conflicting and where the evidence proffered by the defendant serves to bolster his claim that the victim was the initial aggressor. *Id.* Defendant maintains that the second circumstance applies in this case.

¶ 53    "Evidence under the second prong of *Lynch* is admissible only if it constitutes " 'reasonably reliable evidence of a violent character.' " *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 42 (quoting *Lynch*, 104 Ill. 2d at 201). A trial court's ruling regarding the admission of *Lynch* material will not be reversed on appeal absent an abuse of discretion. *Id.* ¶¶ 40, 42. A court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the trial court's position. *Id.* ¶ 40.

¶ 54    As defendant has noted, remoteness in time is a valid consideration in determining whether it is reasonable for a trial court to allow the admission of *Lynch* material. *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 46; *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 49. While this court has stated its belief that a 10-year end point is not a "bright line test" (*Martinez*, 2021 IL App (1st) 182553, ¶ 46), we have nevertheless determined that it is within a trial court's discretion to exclude evidence of a conviction which is 10 or more years old (*Ellis*, 187 Ill. App. 3d at 301-02) or even "slightly more or less than 10 years" old (*Martinez*, 2021 IL App (1st) 182553, ¶ 46).

¶ 55    Here, defendant filed a motion seeking admission of 10 prior incidents he alleged showed Nieves's aggressive and violent conduct, and the State filed a written response. The trial court held a hearing on the motion, during which defense counsel addressed the fact that most of the incidents

occurred more than 10 years prior to the instant case. Counsel argued that the age of the incidents supported admission, as they "show[ed] the longstanding, almost ingrained pattern of violent, threatening behavior by Mr. Nieves." Counsel also asserted that "the fact that some of the cases go back a number of years actually is proof of how compelling this evidence is."

¶ 56    The trial court, after reviewing defendant's motion and the State's written response, hearing extensive arguments from the parties, and discussing relevant authority with them, ruled that the incidents that occurred more than 10 years prior were inadmissible. Specifically, the court noted that it found "the language [regarding] a ten-year limitation in the *Ellis* case to be a—very instructive in this situation." Accordingly, it denied the defense request to admit the older incidents. As for the more recent incidents, it reserved its ruling, stating, "I guess we'll just have to see how this plays out. We can revisit it at the time of trial." Based on this record, we disagree with defendant's position that the trial court's decision was made mechanically. Rather, we find that the trial court thoughtfully and properly exercised its discretion in disallowing the *Lynch* material at issue. See *Martinez*, 2021 IL App (1st) 182553, ¶ 47.

¶ 57    Further, any error in the barring of the *Lynch* evidence was harmless. See *id.* ¶ 48 (any error in excluding *Lynch* evidence is not reversible when it amounts to harmless error); *People v. Armstrong*, 273 Ill. App. 3d 531, 536 (1995) (any error in excluding *Lynch* evidence was harmless beyond a reasonable doubt in light of evidence against the defendant). Under the second *Lynch* prong cited by defendant, a defendant may present evidence of the victim's violent character where witness accounts about how the events in question transpired are conflicting and where the evidence proffered by the defendant serves to bolster his claim that the victim was the initial aggressor. *Lynch*, 104 Ill. 2d at 200. As established at trial, however, witness accounts of how the

shooting transpired here were not conflicting, and the trial court found Nieves *was* the initial aggressor. It found Malkowski and Galva corroborated defendant's statement to Detective Leavitt that Nieves confronted him in the street and yelled at him, and found no evidence rebutted defendant's statement that Nieves threatened to shoot him and reached for his waistband.

¶ 58    Defendant contends that, if the trial court believed that Nieves was threatening to kill defendant as he had done to others in the past, then it was far more reasonable for defendant to fear for his safety. But the court's determination that defendant could not reasonably believe Nieves was reaching for a firearm was based on the evidence that Nieves was unarmed, took off his jacket in apparent preparation for a fist fight, and his attire made it unlikely he was concealing a firearm. Hearing additional evidence that Nieves was physically violent toward and threatened to kill others 10 years earlier would not change that evidence.

¶ 59    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 60    Affirmed.